Sheila **RENDELL–BAKER,**
Plaintiff, Appellant,

v.

Sandra **KOHN** et al., Defendants,
Appellees.

Wayne **KLUG** et al., Plaintiffs,
Appellees,

v.

NEW PERSPECTIVES SCHOOL, INC. et al., Defendants, Appellants.

Nos. 80–1328, 80–1451.

United States Court of Appeals,
First Circuit.

Argued Oct. 6, 1980.

Decided Feb. 12, 1981.

---

Robert J. Doyle, Boston, Mass., with whom Doyle, Playter, Novick & Berkin, Boston, Mass., was on brief, for Sheila Rendell-Baker.

Matthew H. Feinberg, Boston, Mass., with whom Mary Catherine Leonard, and Kassler, Feinberg & Feuer, Boston, Mass., were on brief, for New Perspectives School, Inc., et al.

Betty E. Waxman, Asst. Atty. Gen., Government Bureau, Dept. of the Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for Francis X. Bellotti, et al.

Kurt M. Pressman, with whom Goldstein & Pressman, Cambridge, Mass., was on brief, for Wayne Klug, et al.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

CAMPBELL, Circuit Judge.

These two consolidated appeals from differing judgments in the district court involve claims brought under 42 U.S.C. § 1983 by former staff members of the New Perspectives School, Inc. Plaintiffs contend they were discharged because of exercise of their first amendment rights and without due process. The only question now before us is whether, in discharging plaintiffs, the defendants acted "under color of any statute, ordinance, regulation, custom or usage, of any state."

## I.

The decisions under review both occurred without the taking of any evidence. In *Rendell-Baker*, summary judgment for defendants was entered on the basis of the pleadings, exhibits appended to the complaint, answers to interrogatories, and affidavits submitted in support of and in opposition to defendants' motion for summary judgment 488 F.Supp. 764 (D.Mass.1980). These documents comprise the record in that case. In *Klug*, the court denied a motion to dismiss for failure to state a claim on which relief may be granted, taking the facts alleged in the complaint and supported by the appended exhibits in the light most favorable to the plaintiffs. Strictly speaking, the record in *Klug*, consists only of the complaint, and that case presents only the question whether the district court erred in holding that it did not appear "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Walker Process Equipment v. Food Machinery*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Appellees in *Klug* have, however, invited us to consider the record in *Rendell-Baker* along with their complaint. Given this invitation, and the fact that the additional information in the *Rendell-Baker* proceeding tends, if anything, to support rather than to weaken their claim of state action, we feel free to draw on the records of both cases in describing the school and its relationship to the state, as we ultimately rule against plaintiffs on this critical issue.

### a. *The New Perspectives School*

The New Perspectives School is a small, non-profit school which offers a high school program to students who have had difficulty completing an ordinary high school. The school is organized as a non-profit corporation under the laws of Massachusetts and is located on privately owned property in the Town of Brookline, Massachusetts. The school is operated by a Board of Directors, no member of which is a government offi-

cial or is chosen by any government official or governmental body. The record is silent as to the history of the school; we do not know anything about its age, founding or original sources of funding.[1] The school serves approximately 50 students, all on a tuition-free basis. Virtually all the students have drug, alcohol, or behavioral problems, or have other special needs, and most are referred to the school by the Town of Brookline or the City of Boston under Chapter 766 of the Massachusetts Acts of 1972, or by the Drug Rehabilitation Division of the Massachusetts Department of Mental Health.[2] As of July 1978, when the school answered Ms. Rendell-Baker's interrogatories, all 50 students were referred there by one or more of these governmental bodies. We were informed at oral argument that students could also come to the school through private referral sources or on their own initiative. According to the complaint in *Klug*, the school is authorized to issue high school diplomas certified by the Brookline School Committee.

New Perspectives School has received funds, in varying amounts over the years of its operation, from numerous governmental agencies. In answer to an interrogatory the school indicated the following funding sources: Chapter 766;[3] Town of Brookline; Massachusetts Department of Mental Health; Department of Youth Services; Massachusetts Division of Family and Children's Services; Office for Children; Law Enforcement Assistance Administration (LEAA);[4] Private Contributors and Foundations. For the fiscal year 1975–76, funds from the various governmental sources accounted for approximately 91 percent of the school's budget, while private donations accounted for 9 percent. For 1976–77, the figures were approximately 99 percent and 1 percent.[5] We have no figures for other years, but the school does not suggest that these two years were unrepresentative.

In order to be eligible for these forms of public funding, the school has been required to conform to various governmental regulations. To receive placements, and funding, under Chapter 766, a school must be approved by the Massachusetts Department of Education.[6] The Department has issued a

---

1. At oral argument, counsel for the school indicated that the school was set up initially with private funds but has become increasingly dependent upon public funds as they have become available.

2. Chapter 766, Mass.G.L. c. 71B, § 3, provides that each school committee is required to identify students with special needs and to propose and arrange for an educational program suitable for each such child. Parents may reject the school committee's placement and elect instead a regular school program, unless it is determined that the child's placement in a regular program will seriously endanger the child's health or safety or substantially disrupt the program. If, however, the parents reject the school committee's placement and choose instead another special placement, they must submit the matter to the state advisory commission on special education, unless, of course, they are willing to themselves bear the expense of their chosen program. The district court's memorandum in case No. 80–1451 indicates that the Town of Brookline does not itself maintain facilities for special needs students, but we have found nothing in the record to support that statement.

3. We are not aware of any funding agency called "Chapter 766." Our reading of that statute, Mass.G.L. c. 71B, §§ 3, 4, suggests that responsibility for the costs of special education rests on the school committees of each city, town and region. We therefore interpret the school's reference to Chapter 766 as a funding source as referring to funds received from school committees as payment for services to students placed with the school in fulfillment of the requirements of that statute.

4. We interpret this reference to LEAA as indicating funds granted to the school by the Massachusetts Committee on Criminal Justice, an organization which disburses federal funds received by the state from LEAA.

5. These percentages are approximate, based on rounded off figures given in the school's answers to interrogatories, as follows: for fiscal year 1975–76, $90,000 from government sources and $9,000 from private sources; for 1976–77, $161,000 from government sources and $2,000 from private sources.

6. Mass.G.L. c. 71B, § 4 provides in part:

    "The school committee of any city, town or school district may, to meet its obligations under section three, with the approval of the department enter into an agreement with any other school committee to jointly provide

33-page set of "Guidelines for the Approval of the Day Educational Component in Private Schools under Chapter 766." These guidelines relate to a wide variety of aspects of a school's operation, including financial recordkeeping, student discipline, staff training, use of volunteers, medical examinations for students, parent involvement, health care, subjects of instruction, teacher-student ratio, qualifications of teachers, evaluation of teachers, student records, confidentiality of records, transportation, insurance, food and nutrition, food preparation, toileting procedures, physical space and facilities, and classroom equipment. The guidelines also require that the school carry out each element of the educational plan specified for each child by the local school committee under Mass.G.L. c. 71B, § 3. On personnel policies the guidelines are less specific than they are on some other issues; they require only that the school maintain written job descriptions and a written policy on criteria and procedures for hiring, suspension and dismissal, procedures for handling staff complaints, and provisions for vacations and other benefits.

The school is also bound by its agreement with the Massachusetts Department of Mental Health, Drug Rehabilitation Division. Under that contract, the school, which is designated as "the Contractor," is required to provide counseling, educational and prevocational services for drug dependent or drug abusing persons and to give priority to clients referred by the Division. The contract provides for reimbursement of expenses specified in an attached schedule. The contractor is required to abide by certain general requirements regarding such subjects as equal employment and equal

service, respect for the human rights of the persons served (*i. e.*, with regard to research on human subjects), and avoidance of conflicts of interest. The contract makes no mention of personnel policies or rights of staff members.

The school's contract with the City of Boston subjects it to additional regulation. That contract states as its purpose compliance with the City's obligations under Chapter 71B through "the furnishing of special educational services by private facilities." Under the contract, the school must carry out the educational plan devised by the Boston School Committee for each Boston student placed with the school. The school must submit periodic reports on its services, and it is subject to inspection at any time during normal business hours. Pupil records must be kept confidential, and the school's employees are subject to the state conflict of interest law, Mass.G.L. c. 268A. Except for this latter provision, the school "shall have no capacity to . . . incur any liability on the part of the city. The Facility, its agents or employees shall not have the status or pension rights of a city employee . . . ." The contract also provides that the school, and not the City, shall bear liability for any injuries to students or employees and for any claims "arising from any act or omission of the Facility, its agents or employees . . . ." The school's answers to interrogatories indicated that it is subject to additional regulations by the Department of Youth Services and by the Brookline School Committee, but the record does not include details of these regulations.

In May 1975, the school, through the Town of Brookline,[7] submitted a grant pro-

special education or, subject to the consent of the parent or guardian affected thereby and subject to constitutional limitations, may enter into an agreement with any public or private school, agency, or institution to provide the necessary special education within the city, town or school district."

7. The grant application, submitted as an exhibit by Ms. Rendell-Baker, lists the applicant as the Town of Brookline, with the New Perspectives School listed as the implementing agency. The grant was awarded by the Committee to the

Town for the school. Brookline provided 5 percent matching funds, while the state provided an additional 5 percent. In a "Field Monitoring Inspection" report dated February 25, 1977, a grant manager of the Committee reported that "Although the grant is carried out by New Perspectives School, Inc., the employees are considered Town employees, and therefore no contract exists between Brookline and New Perspectives." At oral argument in this court, however, counsel for Ms. Rendell-Baker indicated in response to a question as to why the Town was not named as a

posal to the Massachusetts Committee on Criminal Justice, a state agency which distributes funds received from the federal Law Enforcement Assistance Administration. The proposal was for a vocational program to provide students and recent graduates with vocational counseling, training in job skills, and placement in jobs. The grant application includes a statement that the applicant would comply with a set of general conditions relating to the use of the funds and to the sources of other funds for the project. Only one of these conditions makes any mention of staff or personnel; that one provides that "The staff and/or consultant competencies and resources necessary to assure successful conduct of the project will be provided. Prior approval of the Committee is required for staff hiring and salary increases of any kind, and for engaging consultants in accordance with OMB Circular A–102 and Federal Procurement Manual M 1700.6."[8] The proposal describes in detail the vocational program, which apparently was already in operation at the time of the grant application, and provides a job description for the vocational counselor. The grant was approved for the year 1976 and renewed for 1977.

b. *Discharge of Ms. Rendell-Baker*

Sheila Rendell-Baker, who had been serving as a volunteer, was hired as the vocational counselor funded by the grant. Ms. Rendell-Baker held that position until she was discharged on January 3, 1977. Her account of the discharge, as alleged in her complaint, is as follows: In December 1976, a controversy arose between a group of students and the school's director, Ms. Sandra H. Kohn, related to the responsibilities of a student-staff council in the hiring of staff. The students presented a petition at a meeting of the Board of Directors. Ms. Rendell-Baker voiced support for their position, and Ms. Kohn voiced opposition. On January 3, 1977, without prior notice, Ms. Kohn requested that Ms. Rendell-Baker resign. When Ms. Rendell-Baker refused to resign, Ms. Kohn discharged her, without citing any specific cause or allowing her any opportunity to respond to allegations against her.

After her discharge, Ms. Rendell-Baker, through her attorney, contacted the school and demanded either reinstatement with back pay or a hearing, on the ground that she had been discharged for exercise of her first amendment rights and without due process. After an exchange of letters, which Ms. Rendell-Baker submitted as affidavits, the school agreed to apply retroactively a newly adopted personnel policy, which provided for involuntary termination for specified causes, subject to review by a three-member grievance committee. The school's president appointed a grievance committee, but Ms. Rendell-Baker objected to its composition and demanded a formal hearing before a mutually agreeable committee. The record does not reflect any further action by the school on the matter.

On December 13, 1976, the school informed the Committee on Criminal Justice by letter that Ms. Rendell-Baker had been terminated, effective January 14, 1977, and that the school had chosen a candidate to fill the position. On January 17, Ms. Rendell-Baker's attorney sent to the Committee a copy of his letter to the school protesting her discharge. A representative of the

defendant, that she was not aware of the involvement of the Town of Brookline until discovery for this action was conducted on the state defendants.

8. Defendant Highgas states, in his affidavit in support of defendants' motion for summary judgment in *Rendell-Baker*, that the Committee's prior approval of hiring consisted of reviewing resumés submitted by the school to ensure that applicants' qualifications met the requirements established by the school in its proposal, and that the Committee did not interview applicants or exercise any subjective judgment in the hiring process. In this regard, defendants cite LEAA Circular A–87, which provides in part:

"Each grantee or contractor organization, in recognition of its own unique combination of staff facilities and experience, will have the primary responsibility for employing whatever form of organization and management techniques may be necessary to assure proper and efficient administration."

Committee informed the school, in a letter dated February 23, that "While the Committee makes no comment on the matter, you are advised that no candidate to fill the subject position will be approved until such time as you provide me with written justification of your action, specifically citing any rules and regulations under which the action was taken." The school responded with an account of its actions,[9] and the Committee answered, on March 29, indicating that it was satisfied.[10] The Committee then informed Ms. Rendell-Baker's attorney, in response to his request that it hold a hearing, that:

"The Committee is not in a position to demand that a hearing be held or to impose sanctions against New Perspectives School, Inc. for its failure to hold such a hearing. The Committee can, however, hold Ms. Kohn to her assurances before approving a new hire to fill Ms. Rendell-Baker's position." [11]

Ms. Rendell-Baker brought this suit in July 1977.[12] Upon completion of discovery, defendants Bellotti and Highgas moved for summary judgment on the ground that Ms. Rendell-Baker's dismissal had not occurred "under color of state law." Alternatively, they sought dismissal of the action as to themselves. Ms. Rendell-Baker submitted a memorandum opposing the motion, but she neither contested nor conceded that no material issues of fact remained on the question of state action. By an order dated April 16, 1980, the district court granted both motions.[13] Ms. Rendell-Baker brought appeal No. 80–1328.

### c. Discharge of the plaintiffs in case No. 80–1451

Case No. 80–1451 arises out of a later series of disturbances at the school. According to the complaint, during the 1977–78 school year, the school experienced a considerable amount of dissension among both faculty and students. Some members of the faculty considered the school's difficulties attributable to inadequate management by the Director, Sandra Kohn; in May 1978 the plaintiffs wrote a letter to the school's Board of Directors urging it to discharge Ms. Kohn. The Board responded by affirming its confidence in Ms. Kohn. On June 5, 1978, students of the school picketed the home of James Schlesinger, president of the school's Board of Directors, to express opposition to Ms. Kohn's directorship. Ms. Kohn directed the staff to tell the students that further picketing would cause their suspension. The staff did so, but the plaintiffs later informed her that an attorney had advised them that the prohibition on

---

**9.** The school's response occurred in two separate letters. The Committee answered the first with the following statement: "[W]hile you explain your actions in great detail, you fail to shed any light on exactly how the decision was reached, whether or not you adhered to any established criteria or procedure, and what kind of notice was given to Ms. Rendell-Baker." The school's second letter apparently satisfied the Committee.

**10.** This letter from the Committee included the following:

"You are advised, however, that if you move to fill the vacant position and you choose to expend funds, you will not have LEAA money available to meet a successful claim for back pay by Ms. Rendell-Baker. Payment of such a claim would be allowable to the extent that the salary remains unexpended. LEAA funds may not be used to pay any other form of damages or any fines or penalties that might be levied against the New Perspectives School, Inc."

**11.** The reference to "assurances" appears to indicate Ms. Kohn's statement, in her letter to the Committee, that the school's personnel policy would be applied retroactively so that the matter could be heard by a grievance committee.

**12.** Named as defendants were the school, the members of its Board of Directors, including Ms. Kohn, both individually and in their official capacities, Francis X. Bellotti as chairman of the Massachusetts Committee on Criminal Justice, Robert J. Kane, former Executive Director of the Committee, and certain federal officials in their capacities as officials of LEAA. William Highgas, current executive director of the Committee, was later substituted for his predecessor, and the federal defendants were dismissed by order of the district court on April 12, 1980.

**13.** The order terminating the action is phrased as a dismissal, although it occurred in response to a motion for summary judgment.

student picketing was unconstitutional. Sometime during this period, the *Brookline Chronicle* carried an article about the disturbances at the school. On June 15, 1978, a letter to the editor appeared in the *Chronicle* in which the plaintiffs refuted some statements in that article and stated their belief that the prohibition on picketing was unconstitutional. That same day, the plaintiffs informed Schlesinger that they were forming a labor organization. On June 16, Ms. Kohn discharged four of the plaintiffs. A fifth, Dawn Fonseca, had previously resigned but later offered to withdraw her resignation. Mr. Schlesinger declined the offer and accepted her resignation on June 9.

The five plaintiffs brought this suit in December 1978, naming as defendants the New Perspectives School and each of its directors, both individually and in their official capacity. The school moved to dismiss on the ground that it had not acted "under color of state law." The district court denied the motion but certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). We granted leave to appeal and consolidated the two cases.

### II.

Section 1983 of 42 U.S.C. provides for legal liability in favor of an injured party against,

> "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

In the *Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883), the Supreme Court declared, "It is state action of a particular character that is prohibited. Individual invasion of individual rights is not the subject matter of the [fourteenth] amendment." The Court reiterated this principle in *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1947),

when it stated that "the action prohibited . . . is only such action as may fairly be said to be that of the states. [The fourteenth] amendment erects no shield against merely private conduct, however discriminatory or wrongful." The question before us, therefore, is whether the action of the New Perspectives School in discharging the plaintiffs "may fairly be said to be that of the State."

Plaintiffs in the two cases argue, citing *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), that the New Perspectives School is "sufficiently intertwined with the state to imbue its actions with the color of state law"—that is, that the school is in reality a state institution, so that any action by it is action of the state. Ms. Rendell-Baker makes the alternative argument that, because of the action of the Committee on Criminal Justice in creating and funding her position and in approving her discharge, the school's action in regard to her is attributable to the state even though other action by the school would not be.

Defendants, citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 447 (1974), and *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), argue that action of the school may be considered state action only if the state participated directly in the particular action which is under attack, no matter how close the overall relationship between the school and the state. Defendants point out that the decision to discharge the plaintiffs was made by privately appointed officials of the school, not by any state officials, and that no state agency had undertaken to regulate or control the school's policies or procedures for hiring and firing staff. They conclude, therefore, that plaintiffs' discharges were not the action of the state.

In *Burton*, the Court found state action in the discriminatory service policy of a privately operated restaurant located in a publicly owned parking garage. There was no question that the restaurant controlled its own affairs and had reached on its own the

decision to refuse service to blacks. But the Court found that "The State has so far insinuated itself into a position of interdependence with Eagle [Coffee Shop] that it must be recognized as a joint participant in the challenged activity." *Id.*, 365 U.S. at 725, 81 S.Ct. at 862. The Court emphasized the restaurant's use of "an integral part" of a publicly owned and maintained building which was by statute dedicated to "public uses," and the mutual benefits conferred upon both the restaurant and the parking authority by their association. The Court noted particularly that, to the extent that the restaurant's discriminatory service policy contributed to its profits, that policy contributed also to "the financial success of a government agency." *Id.*, at 724, 81 S.Ct. at 861. The Court warned, however, that it did not intend "to fashion and apply a precise formula for recognition of state responsibility," and that "only by sifting facts and weighing circumstances can the nonobvious involvement of the state in private conduct be attributed its true significance." *Id.*, at 722, 81 S.Ct. at 860.

. In *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Court found no state action in the discriminatory service policy of a private club which held a state liquor license, despite the state regulation that went with the grant of a liquor license. The Court expressed no disapproval of *Burton*, but rather distinguished that case on the ground that the Moose Lodge was not located on public property and did not have the sort of "symbiotic relationship" with the state that the Eagle Coffee Shop had had. *Id.*, at 175, 92 S.Ct. at 1972. Finding no close overall relationship, as in *Burton*, the Court considered whether the regulations of the State Liquor Control Board in any way encouraged racial discrimination, and found that they did not.

The Supreme Court's most recent pronouncements occur in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 447 (1974). There the Court found no state action in the discontinuation of service to a customer, without a hearing, by a privately owned and operated, but heavily regulated, utility company. The Court defined the inquiry as "whether there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the state itself." *Id.*, at 351, 95 S.Ct. at 453. To answer this question, the court considered whether the state had directly encouraged or approved the particular practice under challenge, and found that it had not. But the Court did not stop there. It again distinguished *Burton*, without expressing any disapproval of that case, finding that extensive regulation and performance of a public service "affected with a public interest" were not enough to show the "symbiotic relationship" found in that case.[14]

The plaintiffs in these cases argue that *Burton* and *Jackson* establish two distinct tests, with the *Jackson* test applicable where the *Burton* test fails, and that the *Burton* test is satisfied here. Defendants respond that *Jackson*, together with *Moose Lodge*, has implicitly overruled *Burton*, and has established as determinative of state action a test of the direct connection between the state and the challenged action. A panel of this court indicated in *Downs v. Sawtelle*, 574 F.2d 1, 8–9 (1st Cir. 1978) (finding state action in an involuntary sterilization at a community hospital run by a town-appointed Board of Directors), that it did not believe that *Burton* has been overruled. It stated, at 9:

> "The essence of *Burton* which survives *Jackson* is that the relationship between the state and the private institution may be so intertwined that the state will be held responsible for conduct with which it had no direct connection."

*See also Holodnak v. Avco Corp.*, 514 F.2d 285 (2d Cir. 1975) (applying *Burton*, after *Jackson*, to find the first amendment applicable to an employee of a company doing

---

14. The *Jackson* Court did not accept the assertion that the utility held a state-granted monopoly. *See* p. 351, n.8, 95 S.Ct. at 454, n.8.

defense-related work on United States government property).

The more difficult problem, of course, is to decide what constitutes such an "intertwined" relationship. Although we do not presume to establish the "precise formula" which the Supreme Court has declined to fix, we think it possible to identify certain factors which have tended to weigh heavily in findings of such a relationship. In *Burton* itself, the strongest factor seemed to be the use of public property, and particularly its use in a way that excluded a segment of the public. We relied heavily on the same factor in *Fortin v. Darlington Little League*, 514 F.2d 344 (1st Cir. 1975) (state action found in sex discrimination by Little League, all of whose activities were carried out on town field specially laid out for Little League use). *See also Holodnak v. Avco Corp.*, 514 F.2d 285; *Gilmore v. City of Montgomery*, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1973) (city enjoined from permitting exclusive use of public parks by segregated private groups, where the city had previously been ordered to desegregate the public parks).

*Downs v. Sawtelle*, 574 F.2d 1, involved public property only in the sense that the Town had a right to receive the hospital's profits and its assets upon dissolution. The more significant factor there, however, was that the Town Board of Selectmen appointed the hospital's entire Board of Directors. That factor made the case an example of a situation where "state involvement with a private entity ... is 'so dominant as to afford a basis for a contention that the state is merely utilizing private trustees to administer a state activity.'" *Braden v. University of Pittsburgh*, 552 F.2d 948, 974 (3d Cir. 1977), Garth, J., concurring, quoting *Powe v. Miles*, 407 F.2d 73, 81 (2d Cir. 1968). In such a situation, every decision made by the nominally private entity may fairly be attributed to the state, since the decisionmakers derive their authority from the state.

In *Powe v. Miles, supra*, and *Braden v. University of Pittsburgh, supra*, the courts relied on expressions of intent by the states to treat a disputed entity as arms of the state.[15] In each of those cases, the state legislature had passed a statute indicating the nature of the state's relationship to the university involved. In the *Pittsburgh* case, the statute specifically declared that one university to be state-related, and it changed the school's name to indicate the state's role. In *Powe v. Miles*, New York statutes designated the state contract colleges as integral parts of the state university, and referred to the private university which housed the contract college in question as "the representative of the state university trustees." *Id.*, at 83. These cases indicate that where a state expresses its own understanding that an institution is under its control and subject to its constitutional obligations, these expressions may be given great weight.

Finally, should a public institution be placed in private hands with the actual purpose of evading constitutional requirements, the courts may look beyond the formal structure of the institution to find other indicia of state involvement. *See, e. g., Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (appointment of private trustees to manage a previously public park, the use of which was limited to whites by the will of the donor, found insufficient to divest the park of its public character); *Gilmore v. City of Montgomery*, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304.

### III.

We have carefully considered the facts of this case, and although we note a considerable degree of cooperation between the state and the school, we are not persuaded that any of the particular factors we have discussed applies to the New Perspectives School, or that any other factors justify a finding that the challenged action occurred "under color of state law." Plain-

---

**15.** Both these cases also involved some use of public property and some state representation on the schools' boards of directors.

tiffs concede that the school does not conduct its activities on public property or within public facilities, as in *Burton* and *Fortin, supra*, and there is no suggestion of a subterfuge to avoid constitutional obligations through creation of a sham private entity as in *Evans* and *Gilmore*. To be sure, we are told the Town of Brookline permits the school to issue high school diplomas certified by its school committee. Arguably this amounts to an expression of intent by the Town comparable to that of the governmental bodies in *Braden* and *Powe*, to treat the school as a public institution.[16] The state's other pronouncements, however, particularly the references to private schools in Mass.G.L. c. 71B, § 4, and in the Department of Education's guidelines, and the references to the school as a contractor in the Department of Mental Health Agreement and the City of Boston contract, all indicate that the state does not regard the school as a public institution. *See also* note 9, *supra*, regarding the LEAA policy, which is binding on the state's Committee on Criminal Justice. These indications that the state regards the school as private outweigh any contrary inference from Brookline's certification of the school's diplomas.

Plaintiffs would have us focus on the state's purported dominance in the affairs of the school, to bring the case within our holding in *Downs v. Sawtelle*. They rely particularly on four aspects of the relationship between the state and the school: (1) almost complete state funding; (2) extensive regulation; (3) the school's performance of the "public function" of education, particularly special education required of local communities by state law; and (4) mutual benefits which the school and the state derive from their relationship.

The school's funds do, in fact, derive almost completely from governmental sources.[17] This, in our view, is the strongest factor indicating state action. We have, as have other courts, indicated on past occasions that lesser contributions of state funding are not enough to demonstrate state action in all aspects of the operations of an institution. *Cannon v. University of Chicago*, 559 F.2d 1063 (7th Cir. 1976) (undetermined amount of state funding of medical school did not show state action in the school's admissions policies); *Berrios v. Inter-American University*, 535 F.2d 1330 (1st Cir. 1976) (Puerto Rico University's suspension of students was not state action, despite an undetermined amount of public funding and some regulation by the Commonwealth's accrediting body). *See also McQueen v. Drucker*, 438 F.2d 781, 784 (1st Cir. 1971) ("Mere receipt of financial subsidy and subjection to some regulation are the conditions of much of our societal life.") This school's virtual dependence on state financial support goes well beyond anything we have considered before. Since state funds support every aspect of the school's operation, everything the school does, it can be argued, is made possible by the state. And the state could, if it chose to do so, veto any action of the school it found objectionable by threatening to withdraw its financial support. But the school's dependence on state funds, in itself, demonstrates only that the state has the potential to control the school's operations, not that it actually does so. As a practical matter, the state has the same latent power in relation to any contractor whose primary customer is the state.[18] Indeed the state's power to

---

16. The record is not clear whether the diplomas issued are the same as those received by graduates of Brookline High School, or whether Brookline merely certifies in some manner the diplomas issued to Brookline students placed under Chapter 766 in all private schools.

17. Defendants argue that we should not count in this calculation funds originating with the federal government. Since the amount of those funds is too small to affect significantly the school's overall dependence on state funding, this case does not turn on the effect of federal

funds. We note, however, that the federal funds were funneled through a state agency which appears to have considerable discretion in making grant awards. The exercise of such discretion is doubtless a factor to be weighed in favor of state action, even if the funds themselves are federal in origin.

18. There are, for example, a considerable number of businesses, such as manufacturers of defense-related equipment, and some research and consulting firms whose clientele consists mainly or entirely of governmental agencies.

control any nominally private institution is limited only by the constitutional boundaries of the police power, even where the state does not provide funding. In practice, of course, the state's exercise of its power to control an institution is likely to be greater where it assumes the burden of financial support; for that reason, state funding may be significant evidence of state control. But to find that an otherwise privately operated institution is so dominated by the state that all its actions occur "under color of state law," we must find that the state actually does control the institution, not just that it could do so. In the case of a non-profit organization, the directors' fiduciary duty is to further the causes for which the entity was chartered, regardless of the sources of its funding. For example, a school for the deaf or the blind, managed by an all-private board, does not surrender its rights to pursue independent policies merely because the students are on state-funded scholarships. Even near-complete governmental funding does not turn a private charitable and educational institution into a public entity so long as the private institution remains free, in fact, to control its own affairs.

Plaintiffs would have us infer state domination from the regulations to which the school is subject. The school is regulated by a number of state and local agencies, and some of these regulations are very detailed. But we are not persuaded that the school's "freedom of decision-making has . . . been circumscribed substantially more than that generally accorded an independent contractor." *McQueen v. Drucker*, 438 F.2d at 784–85. The degree of state regulation here is not greater than that exercised over the utility in *Jackson v. Metropolitan Edison*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 447. Each of the various kinds of regulations to which the school is subject would apply as well to a private institution

which contracted with the state to educate one student or to conduct one small program in return for a small amount of funds. The school's contractual obligations to the Department of Mental Health and to the Committee on Criminal Justice are similar to the obligations undertaken by any grantee of government funds; they resemble also the obligation that a grantee of funds from a private foundation might incur. The details are provided by the grantee itself in its grant application; and the general conditions are just that—they impose few constraints on the decision-making power of the grantee's management. The guidelines issued by the Department of Education apply to any school at which a locality seeks to place even a single child under chapter 766; the Department appears to contemplate placement of some children in schools whose other students are all privately funded. The Department's guidelines are particularly detailed as they relate to the services to be provided to students, just as any contract for services spells out in detail the services to be performed. But aspects of the school's operation which do not relate directly to services to students are left to the discretion of the school's privately appointed management, just as other government contractors are left free to manage their own affairs so long as they provide the services for which they have contracted. For purposes of this case, it is particularly important that none of the state agencies involved has undertaken to regulate the school's personnel policies, except to require that its policies be set forth in writing. The content of the school's personnel policies, including criteria and procedures for hiring and firing, has been left to the discretion of the school's management.[19]

[20] Plaintiffs argue that the school performs a public function.[20] They point out

---

**19.** Defendants aver in an uncontested affidavit that the Committee on Criminal Justice reviewed hiring decisions only to ensure that the chosen candidate met the school's own criteria, and that the Committee exercised no subjective judgment in hiring. *See* note 9, *supra*. In any

event, the Committee's grant funded only one position at the school.

**20.** The "public function" concept seems to derive from *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), in which the

that education at the primary and secondary levels, in contrast to higher education, has most often been a public function in this country. *Compare Krohn v. Harvard Law School*, 552 F.2d 21 (1st Cir. 1977) (no state action in Harvard Law School admissions policies, despite public importance of legal education); *Lamb v. Rantoul*, 561 F.2d 409 (1st Cir. 1977) (no state action in denial of tenure to a professor at the Rhode Island School of Design, a college-level art school); *Berrios v. Inter-American University*, 535 F.2d 1330. *But see Weise v. Syracuse University*, 522 F.2d 397 (2d Cir. 1975) (state action found in discharge of instructor at Syracuse University, a nominally private school receiving some public funds). Plaintiffs further insist that Chapter 766 reflects the state's view that special education is a public responsibility, or at least that the state considers it advisable to assume that responsibility. But the fact remains that there is a strong tradition of private elementary and secondary education in this country, and that special education is clearly not an *exclusively* public function. Indeed, it is only recently that public school systems have assumed any responsibility for children with special needs; until a few years ago such children were routinely excluded from public schools. The fact that the state has chosen to perform a service, or to require its political subdivisions to do so, does not make that service an inherently public function.

■ The "public function" concept is strongest, moreover, when asserted by those for whose benefit the state has undertaken to perform a service, or when the state has lent its coercive powers to a private party. In this situation, for example, those students of the New Perspectives School who were placed there by their local school committee, particularly those who are compelled to attend under the state's compulsory education laws, would have a stronger argument than do plaintiffs that the school's action *towards them* is taken "under color of" state law, since the school derives its authority over them from the state. *See, e. g., McQueen v. Drucker*, 438 F.2d 781, in which we found state action in the eviction of tenants by the private owner of a subsidized housing complex.[21] The plaintiffs in this suit, however, are not the intended beneficiaries of the service for which the state has contracted with the school. The school's authority over its faculty derives from the contractual relationship of employment, not from "state law." The school does not perform any public function toward them, even if it may (although we do not now decide the issue) perform such a function toward some or all of its students.

Nor are we persuaded by the argument that the relationship between the school and the state is mutually beneficial, or "symbiotic," as was found to be the case in *Burton*.[22] Any contractual relationship is beneficial to both contracting parties; otherwise they would not enter into it. As we read *Burton*, the importance of the mutually beneficial relationship was that the state

Supreme Court held that first amendment rights of one distributing religious literature applied to the privately owned streets of a company town. The Court emphasized that the company had treated the streets as public and had not restricted access to them. Its holding therefore may imply a kind of public easement based on estoppel.

21. These plaintiffs and other private school teachers are, of course, fully protected against discriminatory treatment by Title VII of the Civil Rights Act of 1964, as well as by state employment discrimination laws. Our ruling therefore in no sense licenses discriminatory policies. Compare *Weise v. Syracuse University*, 522 F.2d at 405 (lesser state action standard for claims of discrimination than for due process claims because of "peculiar offensiveness"

of excluding some citizens from benefits for which all are taxed); *Jackson v. Statler Foundation*, 496 F.2d 623, 635 (2d Cir. 1974) ("conduct which is part private and part governmental must be more strictly scrutinized when claims of racial discrimination are made"); *Wahba v. New York University*, 492 F.2d 96, 100 (2d Cir. 1974) (state action determination depends in part on which provision of the Bill of Rights is alleged to have been violated).

22. We note that the phrase "symbiotic relationship" does not appear in *Burton* at all. That phrase originated with the Court's discussion of *Burton* in its opinion in *Moose Lodge*, 407 U.S. at 175, 92 S.Ct. at 1972, and was repeated in the same context in *Jackson*, 419 U.S. at 357, 95 S.Ct. at 457.

benefited from the particular conduct under attack—the racial discrimination by the restaurant—at least to the extent that that conduct increased the restaurant's business and bolstered its ability to pay rent to the state. We see no such benefit to the state from the conduct under attack here.

The school's funding, regulation, and function all show a relationship of close cooperation with the state. But these factors, together as well as separately, do not demonstrate that the state has so dominated the school as to make all the school's actions, and particularly those related to personnel, attributable to the state.[23] The school's management by a private Board of Directors on which the state is not represented, and the broad range of independent discretion which these directors appear to exercise, particularly in personnel matters, belie the notion of state domination.

The five plaintiffs in case No. 80–1451 rely solely on the overall relationship between the school and the state, and, unlike Ms. Rendell-Baker in case No. 80–1328, *infra*, do not claim any direct involvement of the state in their discharge. For the above reasons, we hold that the district court erred in case No. 80–1451 in denying the school defendants' motion to dismiss. Ms. Rendell-Baker does claim state action even in the absence of an overall state dominance of the school. Her case therefore requires further discussion.

### IV.

■ Ms. Rendell-Baker's arguments are essentially two: first, that because her position was created and funded through the grant of a state agency, she was a public employee even if the other staff members were not; and second, that the Committee directly reviewed and approved her discharge, as evidenced by its exchange of letters with the school. Ms. Rendell-Baker's first argument fails to distinguish her from many other employees of private organizations whose positions are funded by grants from government agencies, foundations, and even private corporations. It is common practice for universities, schools, hospitals, and community organizations to seek and obtain funding for specific positions through grants from these various public and private sources. The individuals employed are not treated as employees of the funding source; rather, they are employees of the grantee. Nor does Ms. Rendell-Baker suggest that she was ever treated, or ever considered herself, an employee of anything but the New Perspectives School. She was chosen for the position and supervised in it by the school's administration, and we have no reason to suspect that she ever had any dealings with the Committee on Criminal Justice or the Town of Brookline until after her discharge.[24]

■ Ms. Rendell-Baker's second argument carries somewhat more weight. The exchange of letters, which we have summarized in our statement of facts, between the school and the Committee suggests that at least the one Committee official who wrote the letters viewed himself as having some authority to oversee the manner in which

---

**23.** We have found only two cases at the circuit court level involving the combination of factors present here. In *Ginn v. Mathews*, 533 F.2d 477 (9th Cir. 1976), the Ninth Circuit found the fifth amendment applicable to the discharge of employees by a federally and state-funded and regulated Head Start program. There, however, hiring and firing were under the control of a Board of Directors, the composition of which was controlled in part by the regulations. *Compare Kelley v. Action for Boston Community Development*, 419 F.Supp. 511 (D.Mass. 1976) (finding no governmental action in the discharge of a Head Start employee). In *Hines v. Cenla Community Action Committee, Inc.*, 474 F.2d 1052 (5th Cir. 1973), the Fifth circuit found no federal responsibility for the dismissal, by a privately appointed board of directors,

of the executive director of a community action agency which was funded and regulated by the Office of Economic Opportunity.

**24.** As we indicated in footnote 8, *supra*, a grant manager of the Committee did report that Ms. Rendell-Baker was considered an employee of the Town of Brookline. But since the grant manager did not elaborate on this observation or cite any evidence for it, and since Ms. Rendell-Baker obviously did not consider herself an employee of the Town (her counsel admits that she did not even know of the Town's involvement in the funding arrangement until discovery), the grant manager must have been mistaken.

the school discharged an employee funded by the grant. Moreover, that official ultimately did determine that the school's procedure met some undefined standard for approval by the Committee. But the Committee's letters do not cite any authority for this oversight, and we have found none in the school's contract with the Committee. The contract provides that the Committee must approve hiring; it makes no provision for approval of firing, nor does it require that any particular personnel policies be observed. If, as defendants' affidavit asserts (and as Ms. Rendell-Baker has not contested), the Committee's approval of hiring consisted only of reviewing the qualifications of the school's chosen candidate, then the Committee had authority to deny its approval for the hiring of a replacement only if it found the candidate's qualifications inadequate, and for no other reason. Nothing in the contract suggests that the Committee is allowed to control the school's personnel policies by exercising its approval powers arbitrarily, as a form of leverage.

The district court's judgment in No. 80–1328 is affirmed.

The district court's order in No. 80–1451 is reversed, and the matter remanded with directions that judgment be entered in that case dismissing the complaint.