### No. 27008

### Peter Skafte v. Clela Rorex, Boulder County Clerk

(553 P.2d 830)

Decided August 23, 1976.

Jonathan B. Chase, for plaintiff-appellant.

French and Riddle, Robert W. Stone, for defendant-appellee.

*En Banc.*

MR. CHIEF JUSTICE PRINGLE delivered the opinion of the Court.

The appellant, Peter Skafte, a permanent resident alien, brought this suit in Boulder County District Court, seeking a declaratory judgment that the Colorado statutes which deny aliens the right to vote in school

elections are unconstitutional. The appellant also sought appropriate injunctive relief. Specifically, the appellant claimed that such a limitation violates the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment, and the Supremacy Clause of Article VI of the United States Constitution. The district court granted summary judgment in favor of the appellee, the Boulder County Clerk, holding the statutory provisions constitutional. We affirm.

The appellant attempted to register for a school election with the Boulder County Clerk and permission to do so was denied by the appellee for the sole reason that the appellant was not a United States citizen. This denial was based on 1971 Perm. Supp., C.R.S. 1963, 123-31-1(3)[1] and 1965 Perm. Supp., C.R.S. 1963, 123-31-6(2).[2] Section 123-31-1(3) defines an elector for the purposes of school elections as a "person who is legally qualified to register to vote for state officers at general elections" and who meets residency requirements. Section 123-31-6(2) provides that registration requirements for school elections "shall be the same as those governing general elections." Consequently, the substantive and procedural requirements concerning general elections are incorporated into school elections. Under C.R.S. 1963, 49-3-1(1)(b),[3] one qualification that electors must meet is that of United States citizenship.

I.

The appellant asserts that the statutes prohibiting permanent resident aliens from voting in school elections violate the Equal Protection Clause.

A.

At the outset, the registrar contends that the Equal Protection Clause has no application to the issue in this case. For this proposition, she relies on section 2 of the Fourteenth Amendment. Section 2 provides, in part:

"[W]hen the right to vote at any election for the choice of electors for president and vice-president of the United States, representatives in congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, *and citizens of the United States*, or in any way abridged, except for participation in rebellion or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state." (Emphasis supplied.)

The registrar argues that section 2 makes the Equal Protection Clause of the Fourteenth Amendment inapplicable to this case, since the specific wording of the section shows that those adopting the Fourteenth

[1]Now section 22-31-101(1), C.R.S. 1973.
[2]Now section 22-31-106(2), C.R.S. 1973.
[3]Now section 1-2-101(1)(a), C.R.S. 1973.

Amendment considered citizenship a valid classification in legislation dealing with the franchise. We do not agree with this contention.

Local school elections are not contained in the types of elections expressly listed in section 2. Moreover, the implicit sanction of a citizenship requirement contained in section 2 for the elections there listed does not warrant a conclusion that the Equal Protection Clause is inapplicable in the instant case. Indeed, the United States Supreme Court has rejected the general proposition that section 2 was intended to supplant the Equal Protection Clause in the area of voting rights. *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

Nevertheless, we do believe that section 2 is helpful in deciding the constitutional questions raised in this appeal. The section demonstrates, as an historical matter, that the requirement of citizenship to exercise the franchise was assumed to be a valid one at the time the Fourteenth Amendment was adopted. Hence, in deciding the constitutional issues in this case, we are mindful of the language of section 2.

B.

■ The appellant asserts that the alienage classification created here requires strict judicial scrutiny. The United States Supreme Court has consistently used language suggesting that citizenship with respect to the franchise is not a suspect classification and that therefore the compelling interest test does not apply. *See Hill v. Stone,* 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Kramer v. Union Free School District No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

C.

■ We hold that the state's citizenship requirements for a school district election do not contravene the Equal Protection Clause of the Fourteenth Amendment. The state has a rational interest in limiting participation in government to those persons within the political community. Aliens are not a part of the political community.

The United States Supreme Court has recognized a state's valid interest in establishing a government and in limiting participation in that government to those within the concept of a political community. *Sugarman v. Dougall, supra,* at 642. The Supreme Court has noted that "alienage itself is a factor that reasonably could be employed in defining 'political community.' " *Sugarman v. Dougall, supra,* at 649. Indeed, the Court has further stated that "implicit in many of this Court's voting rights decisions is the notion that citizenship is a permissible criterion for limiting such rights." *Sugarman v. Dougall, supra,* at 649.

The appellant contends that this justification satisfies the Equal Protection requirement only as it pertains to voting in *general* elections. He contends, however, that a school election is a "special interest" election,

and therefore the proposition that a citizenship requirement is valid for general elections does not apply.

■ We believe that a school election is an election which falls within the class of cases prohibiting aliens from voting contemplated by the Supreme Court in *Sugarman v. Dougall, supra.* We point out that school districts are governmental entities. Elections involving local government units "have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life of more and more of our citizens." *Avery v. Midland County,* 390 U.S. 474, 481, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45, 51 (1968). Further, in *Kramer v. Union Free School District No. 15, supra*, the Supreme Court indicated that school elections are elections involving participation by the political community.

Moreover, voting in school elections involves participation in the decision making process of the polity, a factor which indicates the "general" nature of such elections. It is in fact a determination of participation or not in the government policy-making process which often has been crucial in deciding cases contesting alienage classifications. The Supreme Court in *In Re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), held unconstitutional a requirement that bar examinees be citizens. The court noted that the acts of a lawyer "hardly involve matters of state policy" and that the status of holding a license to practice law does not "place one so close to the core of the political process as to make him a formulator of government policy." 413 U.S. at 729, 93 S.Ct. at 2858, 37 L.Ed.2d at 919 (footnote omitted).

The administration of school districts, however, does involve one in matters of "state policy" and entails the formulation of such policy. Therefore, voting in school elections constitutes participation in the government policy-making process.

Finally, the statutory classification denying aliens the right to vote is properly tailored to the state's interest. In *Perkins v. Smith*, 370 F.Supp. 134 (D. Md. 1974), *aff'd*, 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976), the court upheld as constitutional the exclusion of resident aliens from grand and petit jury panels in state and federal courts. The court noted:

"[I]t is the process of filing for citizenship that establishes . . . loyalty; any attempt at prior screening would undercut the efficiency and significance of existing procedures. Therefore, although the presumption that all aliens owe no allegiance to the United States is not valid in every case, no alternative to taking citizenship for testing allegiance can be devised, so that we conclude that the classification is compelled by circumstances, and that it is justifiable." 370 F.Supp. at 138.

Thus, we conclude that the State has shown a reasonable basis justifying the classification here challenged. Consequently, the citizenship

requirement in school elections does not deprive the appellant of equal protection of the laws.

## II.

■ Next, the appellant contends that the prohibition against voting placed upon resident aliens creates a conclusive presumption in violation of the Due Process Clause of the Fourteenth Amendment.

The statutes do not create an irrebuttable presumption. There is no fact presumed from the status of alienage; rather, the legislature intended to prohibit aliens from voting, and the classification exactly achieves that purpose. The statutes do not purport to be concerned with prohibiting from voting persons with some common trait, which trait is conclusively presumed from the status of alienage. Instead, the statutes only purport to exclude aliens from voting. Thus, they do not create a conclusive presumption.[4]

While it is true that the state interest justifying the classification on equal protection grounds includes a concern for loyalty, awareness of United States laws and customs, and the extent to which voters are informed about political affairs, these interests are not equivalent with the purpose of the statute. To hold otherwise would turn the conclusive presumption doctrine into a "virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution." *Weinberger v. Salfi*, 422 U.S. 749, 772, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522, 543 (1975).

## III.

Finally, the appellant asserts that the statutory voting prohibition is unlawful, either because it is an attempt to regulate immigration and naturalization, or because it violates the Supremacy Clause. This latter argument is premised on the appellant's contention that the Congress has preempted the states in the regulation of aliens.

■ Power to regulate immigration unquestionably rests exclusively with the federal government. *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Takahashi v. Fish & Game Commission*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). But,

---

[4]In *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), the Supreme Court sustained the constitutionality of a regulation in the Truth and Lending Act which made disclosure provisions applicable whenever credit is offered to a consumer for which a finance charge is imposed or which is payable in more than four installments. The Court rejected the argument that the regulation conclusively presumed that debts payable in more than four installments necessarily included a finance charge, stating:

"The rule . . . does not presume that all creditors who are within its ambit assess finance charges, but, rather, imposes a disclosure requirement on all members of a defined class in order to discourage evasion by a substantial portion of that class." 411 U.S. at 377, 93 S.Ct. at 1644, 36 L.Ed.2d at 334.

the Supreme Court has never held that every state provision which deals with aliens is a regulation of immigration and therefore pre-empted by this constitutional power. *DeCanas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). As the court has noted, a regulation of immigration is "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas, supra*, 96 S.Ct. at 936, 47 L.Ed.2d at 48 - 49. The statutes prohibiting aliens from voting do not affect these considerations and "even if such local regulation has some purely speculative and indirect impact on immigration, it does not thereby become a constitutionally proscribed regulation of immigration. . . ." *DeCanas, supra*, 96 S.Ct. at 936, 47 L.Ed.2d at 49.

Furthermore, the federal legislation respecting aliens contained in the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (INA) does not pre-empt the challenged statutes. The challenged statutes are not in conflict with the INA. Therefore, a conclusion that the INA does pre-empt the type of regulation imposed by the challenged statutes would be warranted only if "the nature of the regulated subject matter permits no other conclusion, or . . . Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 257 (1963). Such a conclusion is not warranted in this case.

Voter qualification is a primary example of an area which the states have historically occupied. *Sugarman v. Dougall, supra*; *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). Furthermore, Congress has not manifested an intent to remove from the states the exercise of this power, nor can it with respect to local elections. "Only a demonstration that complete ouster of state power — including state power to promulgate laws not in conflict with federal laws — was 'the clear and manifest purpose of Congress' would justify that conclusion." *DeCanas, supra*, 96 S.Ct. at 937, 47 L.Ed.2d at 50 (citations omitted). The appellant has not made such a demonstration. As stated by the Supreme Court, there is no indication "in either the wording or legislative history of the INA that Congress intended to preclude even harmonious state regulation touching on aliens in general. . . ." *DeCanas, supra*, 96 S.Ct. at 937 - 38, 47 L.Ed.2d at 50. Therefore, the challenged statutes are not invalid under the Supremacy Clause.

The judgment is affirmed.

MR. JUSTICE LEE does not participate.