Enrique **CERVANTES, et al.,**
**Plaintiffs-Appellees,**

v.

Ramiro **GUERRA, et al.,**
**Defendants-Appellants.**

No. 80–1294.

United States Court of Appeals, Fifth Circuit. Unit A

July 13, 1981.

---

Atlas, Hall, Schwarz, Mills, Gurwitz & Bland, Travis Hiester, McAllen, Tex., for defendants-appellants.

George P. Powell, Edinburg, Tex., Linda Yanez, Brownsville, Tex., for plaintiffs-appellees.

Before BROWN, WISDOM and RANDALL, Circuit Judges.

WISDOM, Circuit Judge:

The primary defendant in this case, the Hidalgo County Community Action Agency, Inc., a nonprofit corporation organized under Texas law, receives federal money under the Economic Opportunity Act of 1964, 42 U.S.C. §§ 2701–2995d (1976 & Supp. III 1979). The corporation's bylaws exclude aliens from serving on its board of directors or voting for members of the board. Plaintiffs, two legally resident aliens, challenge those bylaws as inconsistent with the Economic Opportunity Act, regulations adopted to carry out the Act, and the equal protection clause. The district court agreed with all three contentions. We reverse.

I.

The Economic Opportunity Act of 1964 is a comprehensive attempt to reduce the causes of poverty in the United States. Title II of that statute, codified at 42 U.S.C. §§ 2781–2837, provides for federal grants to organizations that qualify as "community action agencies" (CAA's). A public or private nonprofit organization will qualify as a community action agency if it is specially designated as such by state or local authorities, its internal structure meets certain statutory and administrative requirements, and if the Community Services Administration (CSA) determines it to be capable of planning and operating "community action programs"—programs "having a measurable and potentially major impact on causes of poverty in the community . . . ." § 210(a), 42 U.S.C. § 2790(a).[1] The CSA, successor to the former Office of Economic Opportunity, administers the statute and is empowered to promulgate appropriate regulations. §§ 601, 602(n), 42 U.S.C. §§ 2941, 2942(n).

One of the main goals of Title II is to promote "the maximum feasible participation of residents of the areas and members of the groups served [by each CAA], so as to best stimulate and take full advantage of [their] capabilities for self-advancement and assure that [the] programs and projects are otherwise available to and widely utilized by their intended beneficiaries". § 201(a)(4), 42 U.S.C. § 2781(a)(4). The statute therefore requires private CAA's to

---

1. The requirement of state or local designation may be dispensed with in some circumstances. § 210(d), 42 U.S.C. § 2790(d); 45 C.F.R. § 1062.77.

be managed by a "governing board", having at least one-third of its members "persons chosen in accordance with democratic selection procedures adequate to assure that they are representative of the poor in the area served", one-third public officials or their representatives, and the remainder members of organized private interest groups in the community. § 211(b), 42 U.S.C. § 2791(b).[2]

The facts in this case are almost all stipulated. Hidalgo County, Texas, is one of the poorest counties in the United States. Between 48 and 50 percent of its approximately 200,000 residents qualify as poor under CSA standards, and a CAA serving that county can expect initially to receive at least five to ten million dollars in public funds. The county's experience with community action agencies has not been a happy one. The first CAA to serve Hidalgo County ceased to function after it was adjudicated bankrupt and after its executive director was convicted of misuse of public funds—events attributable in part to the failure of its board of directors adequately to oversee its operations. After that debacle, the Commissioners' Court of Hidalgo County, the county's legislative body, appointed a task force to organize a new CAA. In August 1979, that task force incorporated the Hidalgo County Community Action Agency (HCCAA) for that purpose and, in accordance with CSA regulations, served as its interim board of directors until

a board could be selected in compliance with the general statutory mandate. 45 C.F.R. § 1062.200–3(c) (1980).[3] The interim board prepared bylaws for HCCAA providing for a board of fifteen members, five to be elected as representatives of the poor of Hidalgo County from five specified districts. The bylaws required the representatives of the poor to be poor themselves or nominated by someone who is poor. One of the bylaws provided that no one other than a United States citizen would be eligible either to serve on the board or to vote to select board members.

The Commissioners' Court formally designated HCCOA as the CAA for Hidalgo County on September 5, 1979. On the same day the interim board scheduled elections on September 8 to choose the five representatives of the poor. Almost simultaneously, plaintiffs Cervantes and Meza filed this suit under 42 U.S.C. § 1983 (1976) to enjoin the election.[4] Both plaintiffs are aliens lawfully admitted to the United States for permanent residence, and both live in Hidalgo County. Both sought to be nominated for the positions on HCCAA's board reserved for representatives of the poor and to vote in the election to select those representatives. They were denied those rights because of their alienage. In this suit, they assert that the exclusion of aliens from eligibility to vote and to serve on the board: (1) violates the "democratic

2. Section 211(b), as amended, reads:

   Each board to which this subsection applies shall consist of not more than fifty-one, and not less than fifteen, members, and shall be so constituted that (1) one-third of the members of the board are elected public officials currently holding office, or their representatives, except that if the number of elected officials reasonably available and willing to serve is less than one-third of the membership of the board, membership on the board of appointive public officials may be counted in meeting such one-third requirement, (2) at least one-third of the members are persons chosen in accordance with democratic selection procedures adequate to assure that they are representative of the poor in the area served, and (3) the remainder of the members are officials or members of business, industry, labor, religious, welfare, education, or other major groups and interests in the com-

munity. Each member of the board selected to represent a specific geographic are within a community must reside in the area he represents. No person selected under clause (2) or (3) of this subsection as a member of a board shall serve on such board for more than five consecutive years, or more than a total of ten years.

3. CSA regulations pertaining to CAA's are codified in 45 C.F.R. §§ 1050–1075 (1980). On the structure of CAA boards specifically, see CSA Instruction 6400–01a, codified in 45 C.F.R. §§ 1062.200–1 to –4 (1980). All citations in this opinion are to the 1980 codification.

4. The two named plaintiffs purported to represent a class of all similarly situated aliens, but no class proceedings were held and no class was ever certified.

selection procedures/representative of the poor" requirement of § 211(b) and certain CSA regulations, and therefore conflicts with the supremacy clause; and (2) violates the equal protection clause.[5] Named as defendants were the five individual members of the Hidalgo County Commissioners' Court, Hidalgo County itself, and HCCAA. The CSA was not made a party.

After the district court refused to enter a preliminary injunction, the election was held as scheduled on September 8. On February 25, 1980, the district court entered judgment in favor of the plaintiffs: the exclusion of aliens from voting for and serving on HCCAA's board violated the equal protection clause, as well as § 211(b) and pertinent regulations. The court therefore entered an order declaring the bylaw void and setting aside the results of the election of September 8. From this, all of the defendants but HCCAA appeal.

## II.

Our jural world distinguishes behavior attributable to the federal government from behavior attributable to a state government and from behavior of private persons. CAA's do not fit well into that scheme, for their nature combines federal, state, and private genes. Their structure is regulated by the CSA, and the federal government may provide eighty percent or more of their budgets. State and local governments must formally designate them before they may receive federal funds. Local government officials make up one-third of their governing boards. Yet no level of government supervises their day-to-day operations, and their very purpose is to function as autonomous bodies responsive to the poor in the community served.[6] Although constitutional and statutory challenges to actions by CAA's are not new to the federal courts, their peculiarly hybrid nature has left many problems unresolved. It has not been settled whether and when they may be treated as state or federal instrumentalities to which constitutional guarantees are applicable. *See Robison v. Wicheta Falls and North Texas Community Action Corp.*, 5th Cir. 1975, 507 F.2d 245, 250–51. *See also Ginn v. Mathews*, 9th Cir. 1976, 533 F.2d 477; *Mathis v. Opportunities Industrialization Centers, Inc.*, 9th Cir. 1976, 545 F.2d 97.[7] Even assuming that state action can be found here, it is not clear whether a § 1983 action against HCCAA to void a discriminatory bylaw is the correct vehicle for review; it may be that the plaintiffs' only proper recourse is a suit against the CSA to enjoin it from funding HCCAA

---

**5.** Plaintiffs also claimed that the bylaw impermissibly interfered with the federal power over immigration and naturalization. The district court did not consider that argument, and we reject it. *See DeCanas v. Bica*, 1976, 424 U.S. 351, 356, 96 S.Ct. 933, 936, 47 L.Ed.2d 43; *Doe v. Plyler*, 5th Cir. 1980, 628 F.2d 448, 451–53, *prob. juris. noted*, 1981, —— U.S. ——, 101 S.Ct. 2044, 68 L.Ed.2d 347.

**6.** On federal funding limits, see § 225(c), 42 U.S.C. § 2812(c); on the operational independence of CAA's, see § 212, 42 U.S.C. § 2795; *United States v. Orleans*, 1976, 425 U.S. 807, 816–18, 96 S.Ct. 1971, 1976–77, 48 L.Ed.2d 390. Although the § 211(b) requirement that one-third of each CAA's governing board be "public officials" is not explicitly limited to state and local officials, that is what the drafters contemplated, see H.R.Rep.No.866, 90th cong., 1st Sess., *reprinted in* [1967] U.S.Code Cong. & Ad.News 2428, 2448–49, and that has been the practice, see S.Rep.No.95–892, 95th Cong., 2d Sess. 4, *reprinted in* [1978] U.S.Code Cong. & Ad.News 5403, 5406.

**7.** Even if CAA's are not state instrumentalities for all purposes under a "symbiosis" theory, state action may exist in this case because the challenged bylaw was written by a task force appointed by, and presumably under the control of, the Commissioners' Court. *See Flagg Bros., Inc. v. Brooks*, 1978, 436 U.S. 149, 164–66, 98 S.Ct. 1729, 1737–38, 56 L.Ed.2d 185; *Jackson v. Metropolitan Edison Co.*, 1974, 419 U.S. 345, 354–57, 95 S.Ct. 449, 455–56, 42 L.Ed.2d 477. This court held that a CAA was not a symbiotic *federal* instrumentality in a case involving a CAA employee who claimed that he had been arbitrarily discharged in violation of the fifth amendment. *Hines v. Cenla Community Action Committee, Inc.*, 5th Cir. 1973, 474 F.2d 1052, 1057–58. *See also Griffith v. Bell-Whitley Community Action Agency*, 6th Cir., 614 F.2d 1102, 1107–10, *cert. denied*, 1980, 447 U.S. 928, 100 S.Ct. 3025, 65 L.Ed.2d 1122. *Cf. United States v. Orleans*, 1976, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (CAA is not federal instrumentality for purposes of Federal Tort Claims Act).

unless it rescinds the bylaw.[8] On the other hand, even absent state action, it may be that the plaintiffs could imply a cause of action against HCCAA from the Economic Opportunity Act on their statutory claim.[9]

Only some of these issues were raised by the defendants below, and none was explicitly treated by the district court. Because of the way we view the merits and because none of these issues is jurisdictional, we need not address them.[10] It is fair to assume without deciding that the adoption of the bylaw was state action within the meaning of the fourteenth amendment and that a § 1983 action against HCCAA is a proper way to contest the consistency of that bylaw with the underlying statute and the equal protection clause. We reverse on the ground that the bylaw is not forbidden by the Economic Opportunity Act or CSA regulations, and does not violate the equal protection clause.

## A.

■ The CSA's regulations do not elaborate on the meaning of the "democratic selection procedures/representative of the poor" requirement of § 211(b); they expressly leave the formulation of voting procedures and eligibility requirements to the founders of each CAA.[11] The district court relied on 45 C.F.R. § 1062.30, which reads in relevant part:

(a) A CAA must also be free, with regard to the community action program, from any rules or restrictions that would prevent:

. . . .

(4) Free participation in the program by persons who are currently living in

---

**8.** Although § 1983 provides a cause of action to redress state deprivations of rights secured by federal statutes, *Maine v. Thiboutot,* 1980, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555, there may be an exception to that rule when an alternative remedy is available, see *Pennhurst State School and Hospital v. Halderman,* 1981, —— U.S. ——, 101 S.Ct. 1531, 67 L.Ed.2d 694, 713–15, and plaintiffs here might have been able to raise their statutory and equal protection claims in a suit against the CSA under the Administrative Procedure Act. We intimate no view on the availability of such an action or whether, if available, it displaces § 1983. Linked with these two issues is one of remedy: regardless of the form of action, it may be that relief is limited to enjoining the federal government from funding HCCAA unless it rescinds the bylaw. *See id.; Rosado v. Wyman,* 1970, 397 U.S. 397, 420, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442; *PAAC v. Rizzo,* 3rd Cir. 1974, 502 F.2d 306, 314–15, *cert. denied,* 1975, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804; *Griffith v. Bell-Whitley Community Action Agency,* 6th Cir., 614 F.2d 1102, 1108–09, *cert. denied,* 1980, 447 U.S. 928, 100 S.Ct. 3025, 65 L.Ed.2d 1122. *See also Doe v. Plyler,* 5th Cir. 1980, 628 F.2d 448, 453, *prob. juris. noted,* 1981, —— U.S. ——, 101 S.Ct. 2044, 68 L.Ed.2d 347.

**9.** *Cf. Hines v. Cenla Community Action Committee, Inc.,* 5th Cir. 1973, 474 F.2d 1052, 1056, which found no implied right of action in an employee of a CAA to contest his allegedly unlawful discharge. The case for implying a cause of action to enforce the "democratic selection procedures" requirement is much stronger, since that provision was enacted for the especial benefit of the poor in the commu-

nity, Congress showed particular concern for its enforcement, see § 211(b), 42 U.S.C. § 2791(b), and it is not a matter relegable to state law. *See Cort v. Ash,* 1975, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26. The proper analysis for determining when a private cause of action may be implied from a federal statute is an issue on which the Supreme Court presently is divided, however. *See, e. g., California v. Sierra Club,* 1981, —— U.S. ——, 101 S.Ct. 1775, 68 L.Ed.2d 101.

**10.** *See, e. g., Burks v. Lasker,* 1979, 441 U.S. 471, 476 n.5, 99 S.Ct. 1831, 1836, n.5, 60 L.Ed.2d 404 (existence of cause of action may be assumed without being decided).

**11.** This subpart allows the board a good deal of discretion in determining how representatives of the poor are to be selected. It is, for example, the prerogative of the board to include in its bylaws how representation will be apportioned throughout the community— at large, by areas, or from groups designated by the board—and how the selection procedure will be carried out. It is also the board's responsibility to determine how to establish voter eligibility. CSA administering offices will approve a CAA's plan for its adequacy in fostering the maximum feasible participation of the poor in the selection procedure and in assuring fair representation for all of the poor in the community. They will not determine the content of the plan. 45 C.F.R. § 1062.200 App. (A)(1)(b)(2). *See also* 45 C.F.R. §§ 1062.200–3(a)(2)(ii), 1062.-200–3(c).

the community, whether or not they qualify as legal or permanent residents.

This regulation has no bearing on eligibility to serve on the governing board or to vote for board members, however, for it applies only to participation in "community action programs". That is a term of art, specifically defined by § 210(a), 42 U.S.C. § 2790(a). A "program" is a project administered by a CAA; the term does not include the management of the CAA itself. For example, if a CAA operates a legal services program, this regulation forbids it from refusing services to a resident merely because he is an alien. But the regulation in no way speaks to whether that alien must be given a chance to vote for the managers of that program.

If HCCAA's bylaw conflicts with any federal requirement, it is only because of the imprecise language of § 211(b) itself: "democratic selection procedures/representative of the poor". The legislative history gives no specific guidance as to its meaning. The most natural way to interpret the intent of Congress here is by drawing an analogy to the procedures used for the election of members of Congress. Aliens are uniformly ineligible to vote in federal or state elections, and the Constitution itself requires Senators and Representatives to be citizens.[12] We are unwilling to characterize those laws and constitutional provisions as "undemocratic" or "unrepresentative" simply because they exclude aliens. Furthermore, to the extent that there is any ambiguity as to the meaning of § 211(b), the CSA's construction of it is entitled to considerable weight. *See, e. g., NLRB v. Hearst Publications, Inc.,* 1944, 322 U.S. 111, 130–31, 64 S.Ct. 851, 860, 88 L.Ed. 1170; *Gray v. Powell,* 1941, 314 U.S. 402, 411–14,

62 S.Ct. 326, 332–333, 86 L.Ed. 301. The CSA's regulations indicate that it must have reviewed HCCAA's bylaws before they went into effect, and the record contains no indication that it objected to HCCAA's exclusion of aliens.[13] We therefore hold that the bylaw does not conflict with § 211(b) or the pertinent regulations, and proceed to consider the equal protection challenge.

### B.

In most contexts, the suspect classification strand of equal protection analysis follows a familiar pattern. First, the reviewing court must decide whether the class of individuals discriminated against by the government measure in question is in some way "suspect". That evaluation is made by reference to a familiar litany: whether the group has been "subjected to . . . a history of purposeful unequal treatment" or "relegated to . . . a position of political powerlessness", *San Antonio Independent School District v. Rodriguez,* 1973, 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16, or is characterized by an immutable trait to which stigma attaches.[14] The extent to which classification is suspect determines how stringently the analytic tools of equal protection scrutiny should be applied. At one extreme, overt racial classifications will be upheld only if absolutely necessary to achieve a compelling state interest clearly stated by the enacting authority; at the other, discrimination among economic actors will be upheld if there is any rational relationship between the classification and a legitimate state purpose. The determination of the degree of suspectness, and hence of the appropriate standard of review, de-

---

**12.** On the nonexistence of alien suffrage, see C. Gordon & E. Gordon, Immigration and Nationality Law § 1.22 (1979); A. Reitman & E. Davidson, The Election Process: Voting Laws and Procedures 8–9 (1972). On citizenship requirements for Representatives and Senators, see Art. I, § 2, cl. 2; Art. I, § 3, cl. 3.

**13.** *See* 45 C.F.R. §§ 1062.200–3(c), 1062.200 App. (A)(1)(b)(2).

**14.** *See Regents of the Univ. of Cal. v. Bakke,* 1978, 438 U.S. 265, 360, 98 S.Ct. 2733, 2783, 57 L.Ed.2d 750 (Brennan, White, Marshall and Blackmun, JJ., concurring in the judgment in part and dissenting); *Weber v. Aetna Cas. & Sur. Co.,* 1972, 406 U.S. 164, 175, 92 S.Ct. 1400, 1406, 31 L.Ed.2d 768.

pends on the characteristics of the group discriminated against; it is independent of the subject matter of the discrimination.[15] For example, a claim that blacks have been discriminated against in public employment is subject to fundamentally the same standard of review as a claim that blacks have been discriminated against in the public schools.

■ Aliens are "persons" within the meaning of the fourteenth amendment.[16] *Graham v. Richardson*, 1971, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534, the fountainhead of modern analysis of the status of aliens under the equal protection clause, held that state discrimination against aliens must, as a general rule, be searchingly examined.[17] Equating the appropriate standard of review with that applicable to racial classifications, *Graham* struck down a state statute restricting the eligibility of aliens for welfare benefits. 403 U.S. at 372, 91 S.Ct. at 1852. Since then, the Supreme Court has applied "strict" scrutiny under the *Graham* rationale to strike down state laws excluding aliens from state financial aid for higher education,[18] the private practice of engineering,[19] the state bar,[20] and

the state competitive civil service.[21] Aliens do in fact bear most of the usual marks of a suspect class: they have historically been the object of invidious discrimination and, as *Graham* pointed out, aliens are a "prime example" of a politically powerless minority.[22]

■ Yet equal protection analysis of state discrimination against aliens does not always fit the usual pattern, for the appropriate standard of review varies with the subject matter of the discrimination. "Strict" scrutiny does not apply to laws excluding aliens from political roles within the state. *Sugarman v. Dougall*, 1973, 413 U.S. 634, 643, 647, 93 S.Ct. 2842, 2848, 2850, 37 L.Ed.2d 853, states this principle as follows: "[T]he State's broad power to define its political community" permits it to require citizenship in order to vote or to hold "state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government." On the strength of that principle, the Court summarily affirmed decisions allowing

15. The standard of review does vary with the subject matter under the "fundamental rights" strand of equal protection. *See, e. g., Shapiro v. Thompson*, 1969, 394 U.S. 618, 638, 89 S.Ct. 1322, 1333, 22 L.Ed.2d 600. The plaintiffs here did not argue from the fundamental rights strand, even though the right to vote is fundamental. *Kramer v. Union Free School District No. 15*, 1969, 395 U.S. 621, 626–28, 89 S.Ct. 1886, 1889–90, 23 L.Ed.2d 583. The very purpose of the political functions doctrine, as described in the text of this opinion, is to permit the exclusion of aliens from political roles, so it subsumes any fundamental rights argument here.

16. *Yick Wo v. Hopkins*, 1886, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220; *Graham v. Richardson*, 1971, 403 U.S. 365, 371, 91 S.Ct. 1848, 1851, 29 L.Ed.2d 534.

17. Note the limitation to state discrimination. Aliens' protection against federal discrimination under the fifth amendment is appreciably narrower than their protection against state discrimination under the fourteenth, owing to the plenary federal power over immigration and naturalization. *See Mathews v. Diaz*,

1976, 426 U.S. 67, 86–87, 96 S.Ct. 1883, 1894–1895, 48 L.Ed.2d 478; *Hampton v. Mow Sung Wong*, 1976, 426 U.S. 88, 100, 96 S.Ct. 1895, 1903, 48 L.Ed.2d 495; *Narenji v. Civiletti*, D.C. Cir., 1979, 617 F.2d 745, *cert. denied*, 1980, 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815. *See generally* Karst, *The Fifth Amendment's Guarantee of Equal Protection*, 55 N.C.L.Rev. 541 (1977).

18. *Nyquist v. Mauclet*, 1977, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63.

19. *Examining Board v. Flores de Otero*, 1976, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65.

20. *In re Griffith*, 1973, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910.

21. *Sugarman v. Dougall*, 1973, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853.

22. 403 U.S. at 372, 91 S.Ct. at 1852. *See generally* Note, *A Dual Standard for State Discrimination Against Aliens*, 92 Harv.L.Rev. 1516, 1525 (1979).

states to exclude aliens from grand and petit juries, *Perkins v. Smith*, 1976, 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368, *affirming mem.*, D.Md.1974, 370 F.Supp. 134 (three-judge court),[23] and from voting in elections to a local school board, *Skafte v. Rorex*, 1977, 430 U.S. 961, 97 S.Ct. 1638, 52 L.Ed.2d 352, *dismissing for want of a substantial federal question*, 1976, 191 Colo. 399, 553 P.2d 830. In *Ambach v. Norwick*, 1979, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 and *Foley v. Connelie*, 1978, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287, a divided Court upheld laws excluding aliens from employment as, respectively, public school teachers or state troopers.

The apparent anomaly of applying less than strict scrutiny to certain forms of discrimination against aliens, an admittedly suspect class, has made the political functions doctrine the subject of hot debate among commentators.[24] But when the Supreme Court speaks clearly, we are bound to obey. *Sugarman, Skafte, Ambach*, and *Foley* squarely control this case.

■ We read *Skafte* as holding that voting in a public election is always within the political functions exception. Although the Supreme Court summarily dismissed the appeal in *Skafte* for want of a substantial federal question, such a dismissal is a decision on the merits that must be given full precedential effect by lower courts. *Hicks v. Miranda*, 1975, 422 U.S. 332, 343–44, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223. *See also Illinois State Board of Elections v. Socialist Workers Party*, 1979, 440 U.S. 173, 182–83, 99 S.Ct. 983, 989, 59 L.Ed.2d 230; *Mandel v. Bradley*, 1977, 432 U.S. 173, 176, 97 S.Ct. 2240, 53 L.Ed.2d 199. There is no doubt as to the reason for the Supreme Court's action in *Skafte*, because its memorandum of

dismissal cited the political functions dictum of *Sugarman*. *Skafte* specifically involved an election to a·school board, but we see no reason to limit its application to any particular type of election—particularly because of unqualified dicta in other Supreme Court cases that a state may deny aliens the right to vote. *Sugarman*, 413 U.S. at 647, 648–49, 93 S.Ct. at 2850–2851; *Foley*, 435 U.S. at 296, 98 S.Ct. at 1070; *Nyquist v. Mauclet*, 1977, 432 U.S. 1, 11, 97 S.Ct. 2120, 2126, 53 L.Ed.2d 63.

■ None of the political functions cases decided by the Supreme Court to date involved an elective office, and if the premise of that doctrine is the "right ... of the people to be governed by their citizen peers", *Foley*, 435 U.S. at 296, 98 S.Ct. at 1070, arguably every elective office is *ipso facto* within its purview. Service on HCCAA's board is "political" even under the standards applied to appointive offices by *Foley* and *Ambach* : it "involves discretionary decisionmaking, or execution of policy, which substantially affects members of the political community". *Foley*, 435 U.S. at 296, 98 S.Ct. at 1070. *See also Ambach*, 441 U.S. at 75, 99 S.Ct. at 1594. The board of directors of a CAA has the same broad powers of management over the CAA as a board of directors has over a business corporation. It has power "to appoint persons to senior staff positions, to determine major personnel, fiscal, and program policies, to approve overall program plans and priorities, and to assure compliance with conditions of and approve proposals for financial assistance under this subchapter". § 211(e), 42 U.S.C. § 2791(e). *See also* 45 C.F.R. § 1062.200–3(a)(3). Within broad boundaries, they may design and carry out programs tailored to the needs of the poor as

23. *See also Foley v. Connelie*, 1978, 435 U.S. 291, 296, 98 S.Ct. 1067, 1070, 55 L.Ed.2d 287; *United States v. Gordon-Nikkar*, 5th Cir. 1975, 518 F.2d 972; *Rubio v. Superior Court*, 1979, 24 Cal.3d 93, 593 P.2d 595, 154 Cal.Rptr. 734.

24. *See, e. g.,* Rosberg, *Aliens and Equal Protection: Why Not the Right to Vote?*, 75 Mich.L.

Rev. 1092 (1977); Note, *supra* note 22; O'Fallon, *"To Preserve the Conception of a Political Community"*, 57 U.Det.J.Urb.L. 777 (1980); Note, *State Burdens on Resident Aliens: A New Preemption Analysis*, 89 Yale L.J. 940 (1980).

they perceive them. 45 C.F.R. § 1063.-130–.133. And,

> [b]ecause Community Action Agencies are actually located in poor communities and work with and are known by the low-income citizens in such communities, other Federal, State, and local programs have come to view Community Action agencies as the best means to reach low-income persons. In many areas the local community action agency is the only viable organization that local residents interact with on a regular basis. The most identifiable community resource in many rural areas of the country is the local Community Action agency.

S.Rep.No.95–892, 95th Cong., 2d Sess. 13, *reprinted in* [1978] U.S.Code Cong. & Ad. News 5403, 5415.

HCCAA, in particular, disposes of a budget of between five and ten million dollars in public funds, and the programs it administers may directly affect over 100,000 poor residents of Hidalgo County. Even more than a policeman, as in *Foley*, or a public school teacher, as in *Ambach*, the members of HCCAA's board of directors create policy and exercise discretion, and their choices have profound effects on the community. Service on that board is therefore a function that "goes to the heart of representative government" within the meaning of *Sugarman.*

Because both the voting and the service aspects of HCCAA's bylaw fall within the political functions exception to the general rule of *Graham v. Richardson,* we hold that it passes equal protection scrutiny. *Foley* stated that discrimination within the political functions doctrine must still be justified "by a showing of some rational relationship between the interest sought to be protected and the limiting classification". *Foley,* 435 U.S. at 296, 98 S.Ct. at 1070. *See also Ambach,* 441 U.S. at 74, 99 S.Ct. at 1593.

The appellants offer several justifications for the bylaw, arguing that the citizenship requirement will result in a more capable, board and will permit better controls against voting fraud. But *Sugarman* explicitly states that exclusion of aliens from political roles is an end rational and legitimate in itself. 413 U.S. at 647, 93 S.Ct. at 2850. Moreover, the "rational relationship" examination undertaken by the Supreme Court in *Ambach* and *Foley* in each case simply repeated the same factors that went into its holding that the offices involved were within the political functions exception. 441 U.S. at 80–81, 99 S.Ct. at 1597, 435 U.S. at 299–300, 98 S.Ct. at 1072. If, indeed, the political functions exception reflects the "right ... of the people to be governed by their citizen peers", it is hard to imagine how it could possibly be irrational to reserve to citizens a role that has been held to be "governing". We therefore decline to interpret "rational relationship" as requiring more than the showing that a particular office or function is within the political functions doctrine. Since that term, with slight variations, is already applied to various degrees of equal protection scrutiny, ranging from "virtually toothless" to "rationality with bite", we have no trouble interpreting it in this instance to mean scrutiny with no extra teeth at all.[25]

REVERSED.

---

**25.** *See United States Railroad Retirement Board v. Fritz,* 1980, 66 L.Ed.2d 368; *Mathews v. Lucas,* 1976, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651; *Massachusetts Bd. of Retirement v. Murgia,* 1976, 427 U.S. 307, 318– 21, 96 S.Ct. 2562, 2569–71, 49 L.Ed.2d 520 (Marshall, J., dissenting). *See generally* Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1 (1972).