Gerald **B. LEFCOURT**, on behalf of himself and all others similarly situated, Plaintiff-Appellant,

v.

The **LEGAL AID SOCIETY** et al., Defendants-Appellees.

No. 216, Docket 35136.

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1970.

Decided June 18, 1971.

Waterman, Circuit Judge, concurred and filed an opinion, and Levet, District Judge, concurred in part and dissented in part and filed an opinion.

David G. Lubell, New York City (Lubell, Lubell, Fine & Schaap, Stephen L. Fine, New York City, of counsel), for plaintiff-appellant.

William L. Lynch, New York City (Henry P. Wasserstein, New York City, of counsel), for defendants-appellees.

Lewis B. Oliver, Jr., Robert H. Levy and Michael Schwartz, New York City, on behalf of The Association of Legal Aid Attorneys of The City of New York as amicus curiae.

Before WATERMAN and MOORE, Circuit Judges, LEVET, District Judge.*

MOORE, Circuit Judge:

The appellant in this case, Gerald B. Lefcourt (Lefcourt), seeks damages and injunctive relief against The Legal Aid Society (the Society), his former employer. By a complaint filed June 8, 1968, Lefcourt sought reinstatement in his job as a staff attorney for the Society and damages for his allegedly unjustified discharge. He claimed that he

* Of the Southern District of New York, sitting by designation.

was discharged because of statements he had made to fellow attorneys with the Society and because of his role in the organization of "The Association of Legal Aid Attorneys." This, he asserted, was in violation of rights guaranteed to him by the Constitution, particularly his right to Freedom of Speech under the First and Fourteenth Amendments.

After a full trial on the merits on which all the facts leading up to Lefcourt's discharge were developed, the Trial Court made findings fully supported by the evidence and concluded that the complaint should be dismissed on the merits, 312 F.Supp. 1105.

The Society's certificate of incorporation was filed in New York on March 21, 1876. Originally, the name of the Society was "Der Deutsche Rechtsschutz Verein" (The German Legal Aid Society) and its object and purpose was gratuitously to render legal aid and assistance in the City of New York to worthy persons of German birth who were without adequate means to employ other counsel. The Society was to be managed by directors (not less than 12 nor more than 50). Over the years all reference to national origin has been removed. The Society is now "The Legal Aid Society" and gives legal aid and assistance to persons without restriction who are without adequate means to employ counsel.

The By-Laws provide for its membership, namely, contributing individual and law firm members. Management is presently vested in a Board consisting of 48 Directors. Its officers are elected by the Board. The Society's Attorney-in-Chief is designated by the Board; is "subject to the control and direction of the Board"; is "responsible for the Society's legal work; and shall have charge and supervision of its Branches, Bureaus and Offices." Upon recommendation of the Attorney-in-Chief, Attorneys in Charge of Criminal Courts, Family Court and the Civil Branch may be designated.

Properly to fulfill its function in representing the indigent in the New York City area, the Society employs a large number of attorneys and has both Civil, Criminal Court and Family Court divisions, which handle for its clients matters in these respective fields. Although an attorney-client relationship exists between the individual attorney employed by the Society and the client, the client is the client of the Society and does not become the individual client of the attorney employee assigned to the case. The situation is quite analogous to that which exists in a large law firm. Individual lawyers may be assigned to a case but supervision is exercised and policy set by the more experienced seniors. Such a practice is essential for the best interests of the clients.

On December 20, 1967, the Society agreed to hire Lefcourt for a position in its Criminal Courts division on a six months trial basis. During that period, the Society was to retain the right to terminate Lefcourt's services at any time. Lefcourt commenced his period of employment with the Society on January 29, 1968. Initially he was assigned to Part IA of the New York City Criminal Court located in Manhattan. In April, he was reassigned to New York City Criminal Court in Brooklyn. During the month of May, he was active in organizing "The Association of Legal Aid Attorneys," a group of staff attorneys. Subsequently, on May 28, he was transferred back to Manhattan, and assigned to Part ID. Lefcourt suggested to Milton Adler, Attorney-in-Charge of the Criminal Division of the Society, that this was a division where there were only "five lawyers for ten cases." He walked away when Adler questioned him about this response without responding to Adler's query. Lefcourt was then reported to Adler by a lawyer for the Society, also working in the Criminal Court in Manhattan, as having said that "we foment black revolution." Later that week, Lefcourt criticized the Society's attitude toward those who ad-

mitted guilt and wished to plead guilty, saying: "Well, even though these guys are guilty, we still should take it to trial. Maybe we can beat the case. * * * " Lefcourt was thereafter summoned to the office of Anthony Marra, then the Attorney-in-Charge of the Criminal Division of the Society. Marra and Adler told Lefcourt that he was being discharged. Mr. Edward Carr, Attorney-in-Chief of the Society, then ordered an investigation. Lefcourt, his attorneys William Kunstler, Carr, Adler and Marra met on June 14, 1968 to discuss his discharge. After a second meeting on June 21, 1968, Lefcourt was informed on June 25 that his discharge would stand.

█ In addition to the two statements mentioned above as to "fomenting * * * revolution" and as to the Society's practice with respect to pleas of guilty, the Society advances a number of other grounds tending to indicate that Lefcourt was "unhappy," "malcontent," "hostile" and "lacking in judgment," etc. In addition there was proof that he had ignored instructions to report to the office before going to court, was habitually late, and had "nagged" Attorney Adler for greater vacation time and other privileges. The findings of fact of the District Court and its conclusions that the action is without merit are fully supported by the evidence.

The Society must have no misgivings that the best interests of the clients are not the paramount concern of its staff attorneys. Particularly true is this in the criminal field where liberty is in jeopardy. In cases in which the defendant admits guilt, most frequently his interests are best served by an attempt to have any prospective sentence reduced to a minimum—a practice commonly known as plea bargaining. Lef-

court's statement, which the Trial Court was entitled to accept, namely, that, although guilt was assumed, the Society should take the case to trial on the gamble that it might "beat" the case, alone would have been enough to justify the Society's action in believing that he was not representing and would not represent the best interests of their clients. The client should not be the pawn of some young attorney who would play with his [the client's] liberty as a means of attaining personal glory on the chance that by some legal maneuvers he should succeed in "beating" the case. The trial of a criminal case is not to be equated with a throw of dice upon a gaming table. Thus, the Society was completely justified in its conclusion of lack of confidence that Lefcourt would be a proper exponent of its standards.

█ Lefcourt would cover these so obvious facts with a veil of freedom of speech. The veil is far too diaphanous to conceal reality. Lefcourt was deprived of no constitutional rights. As a private citizen he was entitled to express his views within the law on any subject of his choosing. There is no proof to the contrary. However, Lefcourt's right to freedom of speech did not preclude the Society from concluding on the basis of Lefcourt's views that he was unable or unwilling to implement various policies of the Society. He was hired on a six months trial basis which carried with it no right, legal or otherwise, to force himself upon his employer beyond the employer's decision to discontinue the employment.

█ Lefcourt's claim must also fail because there has been no sufficient showing that he has been denied any federal right "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory." [1]

---

1. The "under color * * * " requirement of § 1983 is synonymous with the term "State action." United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). A conspiracy involving private persons to commit lawless violence against a person who has informed the government of a violation of law or who seeks to petition the government for redress of grievances may be deemed to be "under color of law." See In re Quarles, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080

Such a finding is a prerequisite for any relief under § 1983,[2] which affords him his only possible substantive basis for relief. Thus, this defect is jurisdictional in nature.

At all relevant times, the Society was under contract with New York City (the City) to provide legal assistance to indigents facing criminal charges in its courts. Lefcourt, and the division of the Society for which he worked, was engaged exclusively in providing such services, although the Society as a whole was involved in both civil and criminal matters of great variety. This relationship between the Society and the City existed pursuant to the County Law of New York State, Article 18–B, §§ 722 (2) and 722–e (McKinney's Consolidated Laws, c. 11, 1971 Supplement).[3] In fiscal 1968–69, which included the period of Lefcourt's employment with the Society, the City paid the Society $1,900,000 under the terms of its contract with the Society. In addition, the Society was given the use of various offices in City buildings. The Society also received funds under the terms of contracts with various other state and city agencies on account of services performed by divisions of the Society other than that which Lefcourt was associated,[4] and the Society also received private financial contributions, as it had

(1895) and United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1876). (Prosecutions under what is now 18 U.S.C. § 242, which contains a "State action" requirement similar to that found in 42 U.S.C. § 1983.) See also United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) (private persons may not interfere with "right to travel"). This apparent exception to the "State action" requirement is clearly inapplicable here as factually none of the necessary elements are present.

2. 42 U.S.C. § 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States * * * to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress."
In his complaint, plaintiff also mentioned as providing jurisdiction 42 U.S.C. §§ 1981, 1985(2) and (3), 1986 and 1988. These provisions clearly have no application to this case, and § 1988 does not create a right of action in any situation. On appeal, plaintiff has not sought to assert the applicability of these provisions.

3. § 722 provides in part:
" * * * [T]he governing body of the city in which a county is wholly contained shall place in operation throughout the county * * * a plan for providing counsel to persons charged with a crime, who are financially unable to obtain counsel. Each plan shall also provide for investigative, expert and other services necessary for an adequate defense. The plan shall conform to one of the following:
1. Representation by a public defender * * *
2. Representation by counsel furnished by a *private* legal aid bureau or society designated by the county or city, organized and operated to give legal assistance and representation to persons charged with a crime within the city or county who are financially unable to obtain counsel.
3. Representation by counsel furnished pursuant to a plan of a bar association * * * whereby the services of private counsel are rotated and coordinated by an administrator. * *
4. Representation according to a plan containing a combination of any of the foregoing. * * *" (Emphasis added.)
§ 722–e provides in part:
"All expenses for providing counsel * * * shall be * * * a city charge to be paid out of an appropriation for such purposes."

4. The Society also receives funds from four other government sources. It received more than $545,708 in 1968 from the Office of Economic Opportunity through the New York City Anti-Poverty Organization for the purpose of providing neighborhood law offices for the handling of non-criminal matters. It received $342,292 in 1968 from the state through a contract with the Family Court to provide certain "law guardian" services to children with whom that Court is concerned. The Society also represents indigents in the Federal Courts and, like other appointed counsel, is compensated on a per hour basis

since its formation in 1876, although the record does not disclose the extent of these contributions.

Despite references to the contractual relationship between the Society and the City, Lefcourt has stopped short of suggesting that the Society, or the division of the Society with which he was associated, was a mere agency of the City.[5] However, he has made certain allegations which are somewhat suggestive of such a conclusion, and with respect to jurisdiction, it is necessary to examine whether, irrespective of the function the Society performs, it may be an agency of the City by virtue of its contractual relationship with the City.

In our decision in Powe v. Miles, 407 F.2d 73 (2d Cir. 1968), we held that the New York State College of Ceramics, which functioned as a branch of Alfred University, was a State agency while all other branches of Alfred were not. The distinction was that although all branches of Alfred received aid from State agencies in various forms, the State paid all the costs of running the College of Ceramics and retained control over its affairs so that in the last analysis the state "can tell Alfred not simply what to do but how to do it." Lefcourt has failed to establish that the City or any other governmental subdivision or agency had any right whatever to intervene in any significant way with the affairs of the Society with respect to its employment practices or otherwise. Thus, as with the divisions of Alfred College other than the College of Ceramics, it cannot be said that the Society acts under color of State law by virtue of the financial and other benefits which it receives from the City and various other governmental agencies, courts and subdivisions, since there has been no sufficient showing of governmental control, regulation or interference with the manner in which the Society conducts its affairs.[6]

Lefcourt directs his main argument to suggesting that the Society's activities constitute State action because of the function which the Society fulfills and suggests that because the defense of indigent persons accused of criminal activity is mandated by the Sixth

---

for services rendered therein. The Society is similarly compensated for services performed for indigents involved in civil proceedings under the Mental Hygiene Law of New York and the Narcotics Addiction Control Act of 1967.

5. If the Society were a mere agency of the City, the Society itself might not be a proper defendant, since § 1983 may not properly be used in suits against municipalities. Monroe v. Pape, 365 U.S. 167, 187–192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

6. We recognized in Powe v. Miles, *supra*, that with respect to racial discrimination, the scope of State action is somewhat broader. Thus, it was suggested in *Powe* that there would be no State action involved in hiring and firing by the restaurant in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) even though the Court there found that there was State action where the State landlord did not prohibit the restaurant from excluding blacks therefrom. Accord, Wolin v. Port Authority, 392 F.2d 83, 89 (2d Cir.), cert. denied 393 U.S. 940, 89 S.Ct. 290, 21 L. Ed.2d 275 (1969). (Discrimination by Port Authority involves State action but "where the issue involves the exercise of First Amendment rights * * * the inquiry must go further. * * *") The reason for this is that in the area of racial discrimination, State inaction or neutrality has often been found to constitute affirmative encouragement. See e. g., Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1962), cert. denied 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964); Robinson v. Florida, 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964); Bell v. Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964); Lombard v. Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); cf. Kerr v. Enoch Pratt Free Library, 149 F.2d 212 (4th Cir.), cert. denied 326 U.S. 721, 66 S.Ct. 26, 90 L.Ed. 427 (1945); but see Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970). We, of course, have no occasion to discuss the effect which *Abney* may have had on the continued vitality of various other cases cited.

Amendment and State law,[7] the performance of that function by the Society constitutes an essential State function as in Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) and Terry v. Adams, 345 U.S. 461, 73 S. Ct. 809, 97 L.Ed. 1152 (1953). See also Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) and Amalgamated Food Employees Union Local No. 590 v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).[8] In Terry, the Court found "State action" in the exclusion on racial grounds of persons seeking membership in the "Jaybird Party," a private political organization which dominated Texas politics. In the eighteen years since the decision in Terry, courts have been reluctant to declare other private activities to be so fundamental as to be within Terry's ambit. Mr. Justice Douglas, in Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), discussed what activities would be sufficiently fundamental to fall within the Terry rationale. In Newton the Court held that the running of a once public park by a municipality, for the benefit of whites only, constituted State action.[9] Such an activity was deemed similar to a "fire department or police department that traditionally serves the community," but unlike an educational institu-

tion, 382 U.S. at 302, 86 S.Ct. at 490. See Powe v. Miles, supra, 407 F.2d at 80.

Activities which are constitutionally essential to the functioning of the judicial process, including the representation of indigent persons accused of criminal activity, are doubtlessly among the most significant functions that any agency, public or private, might be called on to perform. However, the representation of persons accused of crimes, far from being the function of any agency which "traditionally serves the community" is normally performed for and by private persons. Those who can afford their own counsel value the fact that their relationship with their attorney will be protected by the Courts through the attorney-client privilege. The person with a retained attorney knows that that attorney will use his best efforts consistent with ethics and law, and that no State official is in a position to alter this in any way. The City has sought to have the Society function under similar circumstances. Under the contract, the City retains few controls over the Society, and the Society's obligation under the contract is to its clients and not to the City. Furthermore, the hiring and firing practices of the Society as they relate to this case do not involve

7. See note 3, supra.

8. In Marsh, the Supreme Court held that First Amendment privileges must be accorded to persons on a public (but privately owned) street which was part of a company town. That principle was again applied in Logan Valley which involved the right of union members to picket in a shopping center parking lot. Although Marsh and Logan Valley are particularly applicable to First Amendment freedoms since both cases involve the exercise of such rights, Lefcourt falls far short of being able to claim that these cases are directly applicable, since for the purpose of Marsh and Logan Valley, the actual relationship of the private party with the government is irrelevant. It is apparent that the offices of the Legal Aid Society hardly compare with the street in Marsh or the parking lot in Logan Valley, since the Society's offices did not constitute "an

appropriate place for communication of views on issues of political or social significance" such as a "street, park, shopping center, bus terminal or office plaza." Wolin v. Port of New York Authority, supra, note 6, citing Kalven, The Concept of the Public Forum; Cox v. Louisiana, 1965 Sup.Ct.Rev. 1; Note Regulation of Demonstrations, 80 Harv.L.Rev. 1773 (1967). See N.L.R.B. v. Solo Cup, 422 F.2d 1149 (7th Cir. 1970). Furthermore, even if the Society had such an area under its control, that would not necessarily mean that State action would be involved in the hiring and firing practices of the Society any more than it would have been in the hiring and firing of the private corporations involved in Marsh and Logan Valley. See Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969).

See also note 6, supra.

9. See Evans v. Abney, supra, note 6.

the manner in which the Society carries on its public function.

Although the Society by contract has undertaken to make available to indigents legal services which otherwise governmental agencies might have to assume,[10] its history, constitution, by-laws, organization and management definitely establish that it is a private institution in no manner under State or City supervision or control. Its very independence from any such control is an assurance that those who receive the benefits of its services will obtain these services in accordance with the highest standards of the Bar.

We conclude that Lefcourt has not shown State action in the activities of the Society of which he complains. But even assuming jurisdiction *arguendo*, we hold that Lefcourt has failed to establish a case on the merits.

The dismissal of the complaint is affirmed.

WATERMAN, Circuit Judge (concurring):

In his complaint appellant alleged that, inasmuch as the Society has been assigned by the courts of the State to perform a role which the State of New York is required to perform, the Society is subject to the constitutional limitations on state action, and the Society exceeded these limitations by dismissing him for exercising protected First Amendment rights. Therefore he stated on paper a cause of action based upon 42 U.S.C. § 1983. However, a careful and thorough review of the record could not demonstrate more explicitly that the facts brought out below do not support the allegations. It is clear that the Society did not dismiss appellant because he had criticized the Society's representation of indigent criminal defendants

but because he displayed the lack of conscientiousness and dedication which the Society demands of its staff attorneys. Accordingly, to the extent that the lead opinion holds that appellant's claim is unsupported, I concur therein and concur in affirming the judgment entered in the court below.

LEVET, District Judge (concurring and dissenting):

Insofar as the opinion of Judge Moore concluded that there was no jurisdiction in the district court to entertain this action, I concur and I therefore vote to remand the cause to the district court with instructions to dismiss the complaint upon the ground of lack of jurisdiction.

Insofar as the opinion of Judge Moore states, "But even assuming jurisdiction *arguendo*, we hold that Lefcourt has failed to establish a case on the merits," I must dissent as to the inclusion of this statement for the following reasons:

This court has held that "it was the duty of the court to ascertain whether it had jurisdiction before proceeding to hear and decide the case on the merits." Battaglia v. General Motors Corp., 169 F.2d 254 (2d Cir. 1948), cert. denied 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948); see also Emmons v. Smitt, 149 F.2d 869 (6th Cir. 1945), cert. denied 326 U.S. 746, 66 S.Ct. 59, 90 L. Ed. 446 (1945). The trial court did not make such a determination in the instant case and instead dismissed plaintiff-appellant's complaint on the merits. Lefcourt v. Legal Aid Society, 312 F.Supp. 1105, 1111 (S.D.N.Y. 1970). The course of action chosen by the district court, however, does not prevent this court from examining the jurisdictional question.

---

10. Although the State must see to it that indigents are provided with free legal counsel where they are constitutionally entitled to same, the State need not itself provide such counsel. To subject to the constitutional limitations on State action the hiring and firing and other practices of any private law firm which accepted court appointments to represent indigent claims, would be a highly unreasonable extension of the State action concept and § 1983 and would quite transcend their intended scope.

Although certain defenses and questions of jurisdiction may be waived by the agreements and acts of the parties, lack of jurisdiction over the subject matter may not be waived. United States v. Corrick, 298 U.S. 435, 440, 56 S.Ct. 829, 80 L.Ed. 1263 (1936); Gavin v. Hudson & M. R. Co., 185 F.2d 104 (3rd Cir. 1950).

Rule 12, F.R.C.P., provides in pertinent part:

"Rule 12. Defenses and Objections * * *

"(h) Waiver or Preservation of Defenses

"(3) Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.Rules Civ. Proc. Rule 12(h) (3), 28 U.S.C.

The majority opinion has found that the district court did not have jurisdiction to entertain the suit. This precludes any discussion of the merits of the action by this court. "While the District Court lacked jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." United States v. Corrick, *supra*, 298 U.S. at 440, 56 S.Ct. at 832; see also Kern v. Standard Oil Corp., 228 F.2d 699 (8th Cir. 1956).

Furthermore, when the district court proceeds to the merits despite lack of jurisdiction, that decision is without effect and should not be permitted to stand. As stated in Smith v. McCullough, 270 U.S. 456, 459, 46 S.Ct. 338, 339, 70 L.Ed. 682 (1926): "[I]f there was an absence of federal jurisdiction, this court could not consider the merits, but would have to reverse the decrees of both courts below, and remand the cause to the District Court, with a direction to dismiss the bill for want of jurisdiction." See also Rowe v. Nolan Finance Co., 79 U.S.App.D.C. 35, 142 F.2d 93 (1944); Kansas-Nebraska Natural Gas Co. v. City of St. Edward, Neb., 234 F.2d 436 (8th Cir. 1956). The appeal record of 574 pages contains the testimony of some fifteen witnesses and as we are informed consumed three days of the trial court. The primary function of the district court is to try litigation, but only if jurisdiction exists.

The cause must therefore be remanded to the district court with instructions to dismiss the complaint for lack of jurisdiction.