**Julio C. Lopez GERENA, Plaintiff,**

v.

**PUERTO RICO LEGAL SERVICES, INC., Defendant.**

No. 80–829.

United States District Court, D. Puerto Rico.

April 30, 1982.

---

A. J. Amadeo Murga, Hato Rey, P. R., for plaintiff.

Jose E. Fernandez Sein, Santurce, P. R., for defendant.

## ORDER AND MEMORANDUM

GRANT, Senior District Judge, sitting by designation.

This is an action brought pursuant to the due process clauses of the Fifth and Fourteenth Amendments by an attorney formerly associated with the Puerto Rico Legal Services Corporation (PRLS). He alleges that he was dismissed from employment without procedural due process. More specifically, plaintiff charges that he was dismissed "without prior hearing and in violation of the statutes and regulations applicable to all employees of Servicios Legales de Puerto Rico, Inc. . . . ." Plaintiff's Complaint, ¶ 6. Jurisdiction was sought pursuant to 5 U.S.C. § 701, 42 U.S.C. §§ 1981, 1983 and 28 U.S.C. §§ 1331, 1361 and 1343. The factual circumstances surrounding the dismissal are not important to the matter presently before the Court so a recitation of the facts will not be included.

On July 2, 1980, defendant filed a motion to dismiss for lack of subject matter jurisdiction. In its accompanying memorandum, PRLS argued that neither federal nor state action was present; *i.e.*, PRLS is not the federal government for purposes of jurisdiction under 28 U.S.C. § 1331 and is not the state government for purposes of jurisdiction under 42 U.S.C. § 1983.

In response to PRLS's motion to dismiss, plaintiff cited the decisions in *Rivas Tenorio v. Liga Atletica Interuniversitaria*, 554 F.2d 492 (1st Cir. 1977) and *Varela v. Olivero*, No. 77–749 (D.P.R.1977). In the latter case, the late Judge Toledo, formerly Chief Judge of this Court, had concluded that actions of the PRLS constituted federal governmental action. After being granted the opportunity to file an additional response, PRLS rejected any applicability of *Rivas Tenorio* to the circumstances in this case and further argued that *Varela* was wrongly decided. On May 11, 1981, PRLS's motion to dismiss was denied by Judge Cerezo "on the grounds expressed in this Court's opinion and order in [*Varela*]."

A pretrial order was filed by the parties and approved by the Court on December 9, 1981. In it, the parties state that the case was one brought under 42 U.S.C. §§ 1981, 1983. Plaintiff's claim under the Fifth Amendment was not included. Pursuant to Fed.R.Civ.P. 16, this Court treated the order as controlling this action. Immediately prior to trial, PRLS renewed its motion to dismiss for the same reasons as earlier asserted. Not wanting to delay trial in an already heavily congested calendar, the Court summarily denied the motion based upon Judge Cerezo's previous action in the case.

The jury trial began on January 18, 1982. The Court treated this case solely as a § 1983 action and the jury was so instructed without any objection from plaintiff. On January 20, 1980, the jury returned with a verdict in favor of plaintiff and awarded damages in the total amount of $65,000, comprised of $33,150 for loss of income and $31,850 for mental suffering.

On February 24, 1982, PRLS renewed its motion to dismiss the entire action for lack of subject matter jurisdiction. A conference was held with counsel on this and other motions filed by both sides on February 26, 1982. At that time, discussion centered upon the jurisdiction question. The Court admitted that after reflection and careful review of all the materials, it had some doubts whether governmental action was present. Plaintiff Gerena was asked to file a memorandum on this issue before the Court would rule. He has done so and now the Court will decide this very important and extremely difficult question.

■ The initial argument this Court needs to address is raised by plaintiff Gerena. He argues that this issue has already been decided and that Judge Cerezo's decision should be accorded full deference. This Court is mindful of the law of the case doctrine but further believes its duties with respect to the pending matter are governed by the principles articulated by the Court of Appeals for the Seventh Circuit in *Champaign-Urbana News, etc. v. J. L. Cummins*, 632 F.2d 680, 683 (7th Cir. 1980):

The law of the case is not entitled to the same respect as the doctrine of stare decisis. The law of the case does not demand obsequiousness right or wrong. Mr. Justice Holmes said that the phrase "law of the case" merely expressed the practice of courts generally to refuse to reopen what had been decided but was not a limit on their power. *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). *The only sensible thing for a trial court to do is to set itself right as soon as possible when convinced that the law of the case is erroneous.* There is no need to await reversal. 1B Moore's Federal Practice ¶ 0.404[1], at 407. To modify the law of the case is primarily a matter of "good sense." *Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation of City of New York*, 426 F.2d 619, 628 (2d Cir. 1970), *motion denied*, 403 U.S. 917, 91 S.Ct. 2223, 29 L.Ed.2d 693 (1917), *cert.*

*denied,* 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349 (1972).

(emphasis added).

■ It is also important at the outset to clearly distinguish "behavior attributable to the federal government from behavior attributable to a state government and from behavior of private persons." *Cervantes v. Guerra,* 651 F.2d 974, 977 (5th Cir. 1981). For purposes of this lawsuit, either federal or state action must exist in order for this Court to have jurisdiction. Although the standards utilized to find federal action for purposes of the Fifth Amendment are identical to those utilized to find state action for purposes of the Fourteenth Amendment, *see Warren v. Government National Mortgage Ass'n,* 611 F.2d 1229, 1232 (8th Cir.), *cert. denied,* 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980) and *Geneva Towers Tenants Organization v. Federated Mortgage Inv.,* 504 F.2d 483, 487 (9th Cir. 1974), the distinction between the two must never be forgotten or overlooked. The due process clause of the Fifth Amendment applies to federal government action while the Fourteenth Amendment's due process clause applies to state action. Each will be examined separately.

## I. *State Action*

There are two necessary elements of any claim brought under 42 U.S.C. § 1983.

> First, the plaintiff must prove that the defendant has deprived him of a right secured by the "Constitution and laws" of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right "under color of law."

*Adickes v. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). The pending matter, of course, concerns only the second of these requirements: whether the actions of PRLS constituted state action. As the Supreme Court itself realized in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349–50, 95 S.Ct. 449, 452–53, 42 L.Ed.2d 477 (1974), this "question whether

particular conduct is 'private' on the one hand, or 'state action,' on the other, frequently admits of no easy answer."

Only recently has the Court of Appeals for the First Circuit had an opportunity to articulate the criteria to be applied in determining whether state action is present. In *Rendell-Baker v. Kohn,* 641 F.2d 14 (1st Cir.), *cert. granted,* —— U.S. ——, 102 S.Ct. 385, 70 L.Ed.2d 205 (1981), the court was called upon to decide whether a particular non-profit but state subsidized high school, organized as a non-profit corporation under the laws of Massachusetts and located on private property, could be treated as the state for purposes of § 1983. More specifically, the court framed the issue before it as "whether the action of the New Perspectives School in discharging the plaintiffs 'may fairly be said to be that of the State.'" 641 F.2d at 21.[1] The court discussed at length the three leading Supreme Court precedents governing the determination of state action. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); and *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In response to an argument raised by the defendant that the standard set forth in *Jackson* implicitly overruled *Burton,* the court pointed to its earlier decision in *Downs v. Sawtelle,* 574 F.2d 1, 9 (1st Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978), wherein it expressed its belief that *Burton* had not been overruled. Thus, there remain two separate tests, *Jackson* and *Burton,* which this Court must apply.

· *Jackson Test*

■ In *Rendell-Baker,* the First Circuit summarized the decision in *Jackson* as follows:

> There the Court found no state action in the discontinuation of service to a customer, without a hearing, by a privately owned and operated, but heavily regulat-

---

1. This is the same issue which is presently before this Court, with "Puerto Rico Legal

Services Corporation" replacing "New Perspectives School."

ed, utility company. The Court defined the inquiry as "whether there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the state itself." *Id.* [419 U.S.], at 351, 95 S.Ct. at 453. To answer this question, the court considered whether the state had directly encouraged or approved the particular practice under challenge, and found that it had not. But the Court did not stop there. It again distinguished *Burton,* without expressing any disapproval of that case, finding that extensive regulation and performance of a public service "affected with a public interest" were not enough to show the "symbiotic relationship" found in that case.

641 F.2d at 22 (footnote omitted). The *Jackson* "state function" test was further refined in *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), where the Court narrowed its application by declaring that "[w]hile many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Id.* at 158, 98 S.Ct. at 1734. In *Jensen v. Farrell Lines, Inc.,* 625 F.2d 379, 384 (2d Cir. 1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981), the court elaborated on the analysis to be applied under the *Jackson* standard:

> [C]ourts must find that the conduct of the private actor is equivalent to the performing of a state function, or is traditionally associated with sovereignty. It is not enough if the private entity is merely affected with the public interest; it must exercise powers "traditionally exclusively reserved to the State." *Id.* 419 U.S. at 352, 95 S.Ct. at 454.

(footnote omitted).

This Court now holds that PRLS does not perform services which have traditionally and exclusively been reserved to the State. Providing legal services to the poor in noncriminal actions fails to satisfy the stringent "exclusivity" test set forth by the Court in *Flagg Brothers.* While the test

and decision there have been subject to some academic criticism, *see* J. Choper, Y. Kamisar & L. Tribe, *The Supreme Court: Trends and Developments 1978–79,* at 265–77 (1979), it is the law which must be applied here. This Court finds no reason why the following passage from *Rendell-Baker,* centering on education, is not equally applicable here in the context of legal services to the poor.

> *But the fact remains that there is a strong tradition of private elementary and secondary education in this country, and that special education is clearly not an exclusively public function.* Indeed, it is only recently that public school systems have assumed any responsibility for children with special needs; until a few years ago such children were routinely excluded from public schools. *The fact that the state has chosen to perform a service, or to require its political subdivisions to do so, does not make that service an inherently public function.*

The "public function" concept is strongest, moreover, when asserted by those for whose benefit the state has undertaken to perform a service, or when the state has lent its coercive powers to a private party. In this situation, for example, those students of the New Perspectives School who were placed there by their local school committee, particularly those who are compelled to attend under the state's compulsory education laws, would have a stronger argument than do plaintiffs that the school's action *towards* them is taken "under color of" state law, since the school derives its authority over them from the state. *See, e.g., McQueen v. Druker,* 438 F.2d 781, in which we found state action in the eviction of tenants by the private owner of a subsidized housing complex. The plaintiffs in this suit, however, are not the intended beneficiaries of the service for which the state has contracted with the school. The school's authority over its faculty derives from the contractual relationship of employment, not from "state law." The school does not perform any public function toward them, even if it

may (although we do not now decide the issue) perform such a function toward some or all of its students.

641 F.2d at 26 (emphasis added) (footnote omitted). Of particular importance in this regard is the analysis of the court in *Lefcourt v. Legal Aid Society,* 445 F.2d 1150, 1156 (2d Cir. 1971):

Activities which are constitutionally essential to the functioning of the judicial process, including the representation of indigent persons accused of criminal activity, are doubtlessly among the most significant functions that any agency, public or private, might be called on to perform. *However, the representation of persons accused of crimes, far from being the function of any agency which "traditionally serves the community" is normally performed for and by private persons.*

(emphasis added). Providing legal services to the poor, especially in non-criminal cases, has traditionally been performed by private attorneys through local, state and national Bar programs. The creation of the Legal Services Corporation and the many state and local legal services organizations has been a relatively recent development in American jurisprudential history designed to address legal problems that the private sector has been unwilling or unable to fully and effectively address. Merely because the federal and state governments have elected to act on behalf of the public interest does not transform the created services into ones which have traditionally and exclusively been performed by government. In *Polk County v. Dodson,* —— U.S. ——, ——, 102 S.Ct. 445, 450, 70 L.Ed.2d 509 (1981) (footnote omitted), the Supreme Court stated the following with respect to services performed by public defenders in criminal proceedings: "[t]his is essentially a private function, traditionally filled by retained counsel, for which state office and authority are not needed." This conclusion is equally applicable to the services performed by legal services organizations. Indeed, it would be difficult for anyone to seriously challenge the fact that providing legal services to the poor has been neither a traditional nor an exclusive function of the state. Therefore, this Court concludes that the actions of Puerto Rico Legal Services Corporation in dismissing the plaintiff Gerena do not constitute state action under the *Jackson* standard.

### Burton Test

In *Rendell-Baker*, the First Circuit summarized *Burton* as follows:

In *Burton*, the Court found state action in the discriminatory service policy of a privately operated restaurant located in a publicly owned parking garage. There was no question that the restaurant controlled its own affairs and had reached on its own the decision to refuse service to blacks. But the Court found that "The State has so far insinuated itself into a position of interdependence with Eagle [Coffee Shop] that it must be recognized as a joint participant in the challenged activity." *Id.,* 365 U.S. at 725, 81 S.Ct. at 862. The Court emphasized the restaurant's use of "an integral part" of a publicly owned and maintained building which was by statute dedicated to "public uses," and the mutual benefits conferred upon both the restaurant and the parking authority by their association. The Court noted particularly that, to the extent that the restaurant's discriminatory service policy contributed to its profits, that policy contributed also to "the financial success of a government agency." *Id.,* at 724, 81 S.Ct. at 861. The Court warned, however, that it did not intend "to fashion and apply a precise formula for recognition of state responsibility," and that "only by sifting facts and weighing circumstances can the nonobvious involvement of the state in private conduct be attributed its true significance." *Id.,* at 722, 81 S.Ct. at 860.

641 F.2d at 21–22.

Recognizing the inherent problems which will arise in attempting to decide what constitutes an "intertwined relationship," the *Rendell-Baker* court went on to identify certain factors "which have tended to weigh heavily in findings of such a relationship." *Id.* at 23. Four factors were set out

by the court. First, whether public property is being used, particularly whether the use excluded a segment of the public. Second, whether the decision-making authority of the organization or entity in question was appointed or controlled by state officials. "In such a situation, every decision made by the nominally private entity may fairly be attributed to the state, since the decision-makers derive their authority from the state." *Id.* Third, whether the state has expressed an intent to treat the entity as an arm of the state. "[W]here a state expresses its own understanding that an institution is under its control and subject to its constitutional obligations, these expressions may be given great weight." *Id.* Fourth, "should a public institution be placed in private hands with the actual purpose of evading constitutional requirements, the courts may look beyond the formal structure of the institution to find other indicia of state involvement." *Id.*

Borrowing the language of the court in *Rendell-Baker*, this Court is not persuaded that any of these factors apply here to PRLS, or that any other factors justify a finding that the challenged action occurred "under color of state law." *Id.* The record is void of any evidence which would permit this Court to conclude that any of the factors enumerated in *Rendell-Baker* are satisfied. The first and fourth factors are certainly not satisfied here. The fact most heavily relied upon by plaintiff is that some monetary resources are provided by the Commonwealth. But it is well established that funding is not conclusive. In *Rendell-Baker*, the court stated:

> The school's funds do, in fact, derive almost completely from governmental sources.
>
> \* \* \* \* \* \*
>
> This school's virtual dependence on state financial support goes well beyond anything we have considered before. Since state funds support every aspect of the school's operation, everything the school does, it can be argued, is made possible by the state. And the state could, if it chose

to do so, veto any action of the school it found objectionable by threatening to withdraw its financial support. But the school's dependence on state funds, in itself, demonstrates only that the state has the potential to control the school's operations, not that it actually does so. As a practical matter, the state has the same latent power in relation to any contractor whose primary customer is the state. Indeed the state's power to control any nominally private institution is limited only by the constitutional boundaries of the police power, even where the state does not provide funding. In practice, of course, the state's exercise of its power to control an institution is likely to be greater where it assumes the burden of financial support; for that reason, state funding may be significant evidence of state control. But to find that an otherwise privately operated institution is so dominated by the state that all its actions occur "under color of state law," we must find that the state actually does control the institution, not just that it could do so. In the case of a non-profit organization, the directors' fiduciary duty is to further the causes for which the entity was chartered, regardless of the sources of its funding. For example, a school for the deaf or the blind, managed by an all-private board, does not surrender its rights to pursue independent policies merely because the students are on state-funded scholarships. Even near-complete governmental funding does not turn a private charitable and educational institution into a public entity so long as the private institution remains free, in fact, to control its own affairs.

*Id.* at 24–25 (footnotes omitted).

■ Focusing on what *Rendell-Baker* treated as the crucial factor, the level of Commonwealth control, regulation, influence or interference over PRLS, the Court finds none from plaintiff Gerena's Memorandum or from the record. The very essence of all legal services entities is their independence from political and outside control or intervention. *See* 42 U.S.C.

§ 2996(5). The decision-making authority and processes of PRLS must be and are free from outside influence. Most importantly, the hiring and firing of employees belongs to PRLS and not anyone or anything associated with the Commonwealth. With respect to employee selection, local legal services entities were directed by Congress to:

[S]olicit the recommendations of local bar organizations in the community before staff attorney positions are filled.... It is expected that recipients will fully consider the legal expertise and previous experiences in legal services type work of all applicants and those recommended for staff positions, so that recipients can select the best possible attorneys for their staffs. The Committee expects the corporation to assure that recipients will exercise their independent judgment in hiring of personnel so that the highest quality of legal services to the poor will be provided.

H.R.Rep.No. 247, 93rd Cong., 1st Sess. 10 (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News, pp. 3872, 3881. *See also White v. North Louisiana Corp.,* 468 F.Supp. 1347, 1351 (W.D.La.1979) ("the local legal services organizations are autonomous in their employment decisions"). There is no reason to believe that Congress did not intend this independent judgment to be extended to the dismissal of its employees. In this case, the evidence at trial unequivocally established that the decision to terminate plaintiff Gerena was made internally without any input from any Commonwealth official. Even slight Commonwealth involvement in PRLS and its dismissal of Gerena is absent in this record.

Plaintiff has supplied the Court with absolutely no other evidence to support a finding of Commonwealth action or involvement. In fact, everything points to the opposite. This conclusion is supported by two appellate court decisions. *Graseck v. Mauceri,* 582 F.2d 203 (2d Cir. 1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 91 (1979) and *Lefcourt v. Legal Aid Society,* 445 F.2d 1150 (2d Cir. 1971). In *Lefcourt,* the relationship between a legal services entity and the state was described by the court as follows:

At all relevant times, the Society was under contract with New York City (the City) to provide legal assistance to indigents facing criminal charges in its courts. Lefcourt, and the division of the Society for which he worked, was engaged exclusively in providing such services, although the Society as a whole was involved in both civil and criminal matters of great variety. This relationship between the Society and the City existed pursuant to the County Law of New York State, Article 18–B, §§ 722(2) and 722–e (McKinney's Consolidated Laws, c. 11, 1971 Supplement). In fiscal 1968–69, which included the period of Lefcourt's employment with the Society, the City paid the Society $1,900,000 under the terms of its contract with the Society. In addition, the Society was given the use of various offices in City buildings. The Society also received funds under the terms of contracts with various other state and city agencies on account of services performed by divisions of the Society other than that which Lefcourt was associated, and the Society also received private financial contributions, as it had since its formation in 1876, although the record does not disclose the extent of these contributions.

445 F.2d at 1154–55 (footnotes omitted). The court found no state action present, reasoning:

Lefcourt has failed to establish that the City or any other governmental subdivision or agency had any right whatever to intervene in any significant way with the affairs of the Society with respect to its employment practices or otherwise. Thus, as with the divisions of Alfred College other than the College of Ceramics, it cannot be said that the Society acts under color of State law by virtue of the financial and other benefits which it receives from the City and various other governmental agencies, courts and subdivisions, since there has been no sufficient showing of governmental control, regulation or interference with the manner in which the Society conducts its affairs.

\*     \*     \*     \*     \*     \*

Those who can afford their own counsel value the fact that their relationship with their attorney will be protected by the Courts through the attorney-client privilege. The person with a retained attorney knows that that attorney will use his best efforts consistent with ethics and law, and that no State official is in a position to alter this in any way. The City has sought to have the Society function under similar circumstances. *Under the contract, the City retains few controls over the Society, and the Society's obligation under the contract is to its clients and not to the City. Furthermore, the hiring and firing practices of the Society as they relate to this case do not involve the manner in which the Society carries on its public function.*

Although the Society by contract has undertaken to make available to indigents legal services which otherwise governmental agencies might have to assume, *its history, constitution, by-laws, organization and management definitely establish that it is a private institution in no manner under State or City supervision or control. Its very independence from any such control is an assurance that those who receive the benefits of its services will obtain these services in accordance with the highest standards of the Bar.*

445 F.2d at 1155, 1156–57 (emphasis added) (footnotes omitted). In *Graseck*, the court stated:

> We believe that *Lefcourt v. Legal Aid Society*, 445 F.2d 1150 (2d Cir. 1971), is dispositive of most of the theories advanced by appellant and that the additional facts extant in this case do not compel a contrary result. In *Lefcourt*, a panel of this court held that the dismissal of a legal aid attorney by the Legal Aid Society of the City of New York was not performed under color of state law, notwithstanding the receipt of substantial government funds by the Society. The lack of governmental control over or interference with the Society's affairs was deemed pivotal. *Id.* at 1155.

The similarities between *Lefcourt* and the facts before us are, not surprisingly, striking. The bylaws of both societies are almost identical, *see* note 16 *supra*, their respective contracts were made pursuant to the same New York law requiring the State to implement a plan for furnishing counsel to indigent defendants, *see Lefcourt v. Legal Aid Society, supra*, 445 F.2d at 1155, they both receive substantial government funding (although the Society in *Lefcourt* evidently received some funds for its criminal division from private sources), they are both housed in government buildings, and, most importantly, there is no formal mechanism through which any government entity can exercise control or supervision over the internal operations of the societies. *See id.*

Thus far, *Lefcourt* supports if not compels a finding of no state action. Its reasoning applies with equal force to the instant facts:

> [I]t cannot be said that the Society acts under color of State law by virtue of the financial and other benefits which it receives from the City and various other governmental agencies, courts and subdivisions, since there has been no sufficient showing of governmental control, regulation or interference with the manner in which the Society conducts its affairs.

*Id.* (footnote omitted).

582 F.2d at 208 (footnotes omitted). *Accord, Strait v. Mehlenbacher*, 526 F.Supp. 581, 583 (W.D.N.Y.1981); *Polk v. Lewis*, 499 F.Supp. 302 (S.D.N.Y.1980). *See also Wallace v. Kern*, 481 F.2d 621 (2d Cir. 1973), *cert. denied*, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974); *Ross v. Allen*, 515 F.Supp. 972, 975 (S.D.N.Y.1981); *Gray v. Project More, Inc.*, 469 F.Supp. 621 (D.Conn.), *aff'd without opinion*, 614 F.2d 1286 (2d Cir. 1979).

There is absolutely nothing to indicate that PRLS does not enjoy broad independence with respect to all of its activities, including the hiring and firing of employees. Further, none of the four factors set

forth in *Rendell-Baker* is even remotely satisfied. Plaintiff herein may very well have justifiable grounds to assert some type of wrongful discharge claim. But without the fundamental requirement of state action, his claim does not encompass any constitutional violation. For all of these reasons, this Court must now conclude that the actions of PRLS in dismissing Gerena were not actions of the Commonwealth for purposes of § 1983.

## II. *Federal Action*

This case was treated solely as an action under § 1983. The pretrial order was limited to this cause of action and Gerena's tendered instructions were also limited to § 1983. The jury was so instructed, without objection. Gerena did not request that Fifth Amendment instructions be given to the jury. Although the standards are essentially the same as earlier discussed, they are two separate causes of action. Plaintiff fails to understand this important distinction. Nevertheless, under the circumstances in this case, the Court does not find it a problem. Assuming a properly asserted Fifth Amendment cause of action, the Court would still not possess jurisdiction because there is a clear absence of federal governmental action.

As stated earlier, the *Burton* and *Jackson* tests apply to this inquiry just as they do in determining the presence of state action. Therefore, the analysis and reasons contained in the previous section apply with equal force and weight here. Plaintiff relies on the fact that PRLS receives a majority of its funds from the federal government and that it is regulated by the Legal Services Corporation (LSC). With respect to the latter factor, plaintiff cites many of the provisions of 42 U.S.C. § 2996e.

■ The pivotal issue is the degree and nature of the regulation exercised by LSC over PRLS.[2] Reviewing the statute, the

Court finds that the LSC's regulation does not impair the independence of PRLS to such a degree as to transform the conduct of the latter into conduct of the federal government. Although the LSC is the primary funding source of PRLS, it "does not have the power to supervise the everyday activities of the recipients of its monetary grants." *White v. North Louisiana Corp.,* 468 F.Supp. at 1350. PRLS is not an agent of the LSC. *Id.* at 1351. PRLS must, of course, meet certain restrictions and limitations if it wishes to receive federal funding. *See San Juan Legal Services, Inc. v. Legal Services Corp.,* 655 F.2d 434, 436 (1st Cir. 1981). Plaintiff has cited some of those restrictions. They are, however, relatively insignificant and do not intrude upon the everyday activities and decisions of PRLS. The restrictions are designed only to ensure that the ultimate goals sought by Congress through creation of the LSC are achieved. The broad independence of PRLS is preserved under the general statutory framework.

The status of PRLS is very similar to the status of community action agencies funded by the Office of Economic Opportunity (OEO). In *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), the Supreme Court held that such an agency did not become an agent or instrumentality of the United States so that the federal government could be liable for torts committed by the organization's employees under the Federal Tort Claims Act. Citing the relevant legislative history, the Court emphasized that "Congress intended not to create new federal agencies but rather 'the strengthening of community capabilities'" for dealing with poverty. *Id.* at 817, 96 S.Ct. at 1977. The OEO did impose regulations and guidelines on the local recipients. The Court itself recognized that the federal funds were not granted without some strings attached:

2. The Legal Services Corporation is a nonprofit corporation formed pursuant to the Legal Services Corporation Act of 1974. 88 Stat. 378 (1974) (42 U.S.C. § 2996 *et seq.*). Its purpose is to provide legal services to those who are denied equal access to our system of justice because of inadequate income. *White,* 468 F.Supp. at 1350. The LSC is the successor to the Office of Economic Opportunity, the federal agency which previously administered the legal services programs.

Of course since the community action agencies receive federal funding, they must comply with extensive regulations which include employment policies and procedures, lobbying limitations, accounting and inspection procedures, expenditure limitations, and programmatic limitations and application procedures. 45 CFR pts. 1060–1070 (1974). The OEO also issues numerous guidelines. These regulations and guidelines attempt to assure that the federal money is spent for the benefit of the poor.

*Id.* at 817–18, 96 S.Ct. at 1977–78. Nevertheless, the Court realized that federal oversight is common and, of itself, insufficient to establish federal action.

Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs—or of state governmental bodies—into federal governmental acts.

*Id.* at 816, 96 S.Ct. at 1976. The Court also added:

The regulations do not give the OEO power to supervise the daily operation of a community action agency or a neighborhood program.

Nothing could be plainer than the congressional intent that the local entities here in question have complete control over operations of their own programs with the Federal Government supplying financial aid, advice, and oversight only to assure that federal funds not be diverted to unauthorized purposes.

*Id.* at 818, 96 S.Ct. at 1977. These principles applied in *Orleans* are equally applicable here. PRLS is not converted into an arm of the federal government merely because it is subject to the restrictions set forth in the statute. This Court believes that *Orleans* forecloses reliance by this plaintiff on either the symbiotic-relationship approach or the nexus approach outlined by the Supreme Court in *Jackson* and *Burton.*

The particularly unique status of the LSC and state and local legal services entities must be carefully borne in mind when examining this issue. Independence is the crucial component. *See* 42 U.S.C. § 2996(5) ("[T]o preserve its strength, the legal services program must be kept free from the influence of or use by it of political pressures...."). The legislative history of the Legal Services Corporation Act makes this point clear. *See* H.R.Rep.No.247, 93rd Cong., 1st Sess. (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News, p. 3872. This independence becomes absolutely essential when PRLS adopts positions on behalf of clients which oppose actions or policies of the federal government or the Commonwealth. Frequently, PRLS is an adversary of the federal government or the Commonwealth. *See also Polk County v. Dodson,* 102 S.Ct. at 450 ("In our system a defense lawyer characteristically opposes the designated representatives of the State. The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness.") Without independence, legal services would be placed under tremendous pressure to not pursue otherwise meritorious claims. In this unique position, the LSC hardly becomes symbolized with government nor is it significantly involved with government. Simply stated, the relationship of PRLS to the federal government is much too tenuous to characterize its actions as that of the federal government. It would be stretching the point to believe the federal government is even minimally involved in the activities of PRLS. The scope of administration or control over PRLS by the federal government is insignificant for purposes of federal governmental action.

This conclusion is further buttressed by 42 U.S.C. § 2996d(e)(1) which provides that "[e]xcept as otherwise specifically provided in this subchapter ... the [Legal Services] Corporation shall not be considered a department, agency, or instrumentality, of the Federal Government." While the judicial interpretations of this clause are limited to the applicability of the Administrative Procedure Act to decisions of the LSC, *see Spokane County Legal Services, Inc. v. Legal Services Corp.,* 614 F.2d 662 (9th Cir. 1980), the clause represents another con-

gressional expression that although statutorily created, the LSC exists independently from the federal government. In other words, to function as Congress intends it to function, the LSC, and the local and state legal services organizations, must be disassociated from government. The success and survival of legal services depends on preserving this particularly unique status.

For all of these reasons, this Court concludes that the actions of PRLS in dismissing plaintiff Gerena were not the actions of the federal government.

### Conclusion

The concepts of state action and federal action are certainly two of the most difficult requirements a court is required to analyze and apply. Resolution of any particular question becomes so fact specific that distinctions are created with apparent little meaningful difference. The determinative factor in this case is the amount of control and influence exerted by either the Commonwealth of Puerto Rico or the United States over the activities of PRLS. The burden was upon the plaintiff to establish the presence of either state or federal action and this Court must conclude, based upon the record and the evidence presented at trial, that the actions of PRLS in dismissing Gerena were not the actions of the federal nor the Commonwealth government. This single paragraph found in *Rendell-Baker* summarizes the key reasons for this holding:

> The school's funding, regulation, and function all show a relationship of close cooperation with the state. But these factors, together as well as separately, do not demonstrate that the state has so dominated the school as to make all the school's actions, and particularly those related to personnel, attributable to the state. The school's management by a private Board of Directors on which the state is not represented, and the broad range of independent discretion which these directors appear to exercise, partic-

ularly in personnel matters, belie the notion of state domination.

641 F.2d at 27 (footnote omitted).

The judgment entered in favor of plaintiff Gerena is hereby vacated and the action dismissed for want of jurisdiction.